UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ALLSTATE INSURANCE COMPANY;
ALLSTATE PROPERTY AND
CASUALTY INSURANCE COMPANY;
ESURANCE INSURANCE COMPANY,
and ESURANCE PROPERTY AND
CASUALTY INSURANCE COMPANY,          Civil Action No. _____

          Plaintiffs,

vs.

SUMMIT PHYSICIANS GROUP, PLLC;       **Demand for Jury Trial**
SUMMIT MEDICAL GROUP, PLLC;
SUMMIT DIAGNOSTIC SERVICES,
PLLC; GREATER DETROIT PHYSICAL
THERAPY & REHABILITATION, P.C.
d/b/a MERRIMAN PHYSICAL THERAPY
AND REHABILITATION, INC., OAK
PARK PHYSICAL THERAPY, and
WARREN PHYSICAL THERAPY AND
REHABILITATION, P.C.; DAVID PETER
JANKOWSKI, D.O.; LARAN
JOHNATHON LERNER, D.O.; KEVIN
CRAWFORD, D.O.; and THOMAS
GIANCARLO, D.O.,

          Defendants.

## <u>COMPLAINT</u>

Plaintiffs Allstate Insurance Company, Allstate Property and Casualty

Insurance Company, Esurance Insurance Company, and Esurance Property and

Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys SMITH & BRINK, hereby allege as follows.

## I.   <u>INTRODUCTION</u>

1.     This is a case about three medical facilities, a magnetic resonance imaging ("MRI") facility, and the owners of the same who engaged in a scheme to defraud Allstate by submitting, or causing to be submitted, false and fraudulent medical records, bills, and invoices through the U.S. Mail seeking reimbursement under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, for treatment and services that were medically unnecessary, were fraudulently billed, and were not lawfully rendered.

2.     Defendant Summit Physicians Group, PLLC ("Summit Physicians Group"), inclusive of its assumed name Summit Visiting Physicians Group, is presently owned and controlled by defendants David Peter Jankowski, D.O. ("Jankowski") and Kevin Crawford, D.O. ("Crawford").

3.     Defendant Summit Medical Group, PLLC ("Summit Medical") is presently owned and controlled by defendant Jankowski.

4.     Defendant Summit Diagnostic Services, PLLC ("Summit Diagnostic") was organized by Thomas Giancarlo, D.O. ("Giancarlo") and is presently owned by Summit Physicians Group.

5.     Greater Detroit Physical Therapy & Rehabilitation, P.C. d/b/a Merriman Physical Therapy and Rehabilitation, Inc., Oak Park Physical Therapy, and Warren Physical Therapy and Rehabilitation, P.C. ("Greater Detroit PT") is owned and controlled by defendant Laran Johnathon Lerner, D.O. ("Lerner").

6.     Lerner held an ownership interest in Summit Physicians Group until approximately June 2015.

7.     Giancarlo was a member of Summit Physicians Group during much of the time period at issue in this Complaint.

8.     Summit Physicians Group, Summit Medical, Summit Diagnostic, and Greater Detroit PT (hereinafter collectively referred to as the "Defendant Medical Clinics"), by and through individual defendants Jankowski, Lerner, Crawford, and Giancarlo, knowingly and intentionally engaged in a scheme to defraud Allstate that was designed to exploit the unlimited medical benefits available under Michigan's No-Fault Act.

9.     The purpose of the fraudulent scheme perpetrated by the defendants was to generate claims to, and collect payment from, Allstate pursuant to Michigan's No-Fault Act for the purported treatment of patients who had been involved in motor vehicle accidents.

10.     To achieve their fraudulent objective, the defendants engaged in a comprehensive scheme to render medical treatment, to the extent it was actually

performed, that was predetermined, excessive, and not medically necessary for patients' care, recovery, or rehabilitation.

11.     The defendants targeted a vulnerable group of patients and exploited them for their own personal gain, including prescribing highly-addictive medication and promising disability certificates to hook patients into their practice and keep them returning for ongoing treatment; thus, in every way, the defendants are predators.

12.     The defendants also targeted Allstate and other auto insurers to pay for their excessive and unnecessary treatment.

13.     As discussed below, Lerner and his accomplices' predatory tactics have been identified and were the subject of a 2015 criminal investigation that led to Lerner pleading guilty to healthcare fraud.

14.     The defendants also submitted excessive charges for the MRIs and prescription medication at issue in this Complaint.

15.     Summit Physicians Group and Summit Diagnostic each bill Allstate in excess of $3,000 for each MRI purportedly performed.

16.     However, Jankowski has testified that the cost per MRI to Summit Physicians Group and Summit Diagnostic is less than $600, significantly lower than the amounts charged to Allstate.

17.    The defendants' fraudulent scheme is confirmed by significant documentary and testimonial evidence, discussed below, in addition to the criminal proceedings commenced against Lerner.

18.    Indeed, numerous emails by and between the defendants and third parties confirm that the defendants established a predetermined treatment protocol that did not take into account medical necessity or any patient-specific considerations, but rather was utilized to "make a very profitable number for all involved [as] the numbers are staggering and well worth the effort." *See* Exhibit 1.

19.    The emails specifically discuss that the defendants established their MRI clinic (i.e., Summit Diagnostic) "to capture the Auto [insurance] rates." *See* Exhibit 1.

20.    The emails further confirm that the defendants participated in several *quid pro quo* relationships whereby they referred patients and received patient referrals solely to generate profits for themselves (as stated by one of the emailers, to "fill[] [their] pants full of money"). *See, e.g.,* Exhibit 2.

21.    The fraudulent scheme detailed herein mirrors the scheme to defraud enacted by Lerner against Medicare and to which he pleaded guilty to healthcare fraud for "bill[ing] and caus[ing] Medicare to be billed for a variety of unnecessary prescriptions, tests, and office visits to make it appear as though he was providing legitimate medical services instead of medically unnecessary controlled substances.

Dr. Lerner conducted unnecessary office visits and tests and prescribed the patients the unnecessary controlled substances along with a number of other unnecessary expensive name brand prescriptions." United States v. Lerner, 15-cr-20511-VAR-RSW (E.D. Mich.) at Docket No. 26, p. 4.

22.    Lerner was recently sentenced to 45 months' imprisonment for his fraud, and ordered to pay restitution to the United States of America in the amount of $2,789,409 for his admitted participation in a scheme to commit healthcare fraud from approximately 2008 through June 2015. United States v. Lerner, 15-cr-20511-VAR-RSW (E.D. Mich.) at Docket No. 37.

23.    The medical records submitted to Allstate by the Defendant Medical Clinics were formatted almost identically and were used interchangeably at the different clinics, evidencing the interconnectedness of the Defendant Medical Clinics.

24.    Allstate's investigation of claims submitted to it by or on behalf of the defendants revealed treatment that was not tailored to the clinical needs of each patient and that was unlawful.

25.    Each of the defendants named herein conspired with one another to accomplish and to further the objectives of their fraudulent scheme.

26.    All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

27.     The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in the payment of No-Fault benefits from Allstate to, or on behalf of, the defendants.

28.     In each claim at issue in this Complaint for which Allstate is seeking damages, an Allstate automobile insurance contract issued in the State of Michigan was the platform upon which the defendants perpetrated their fraudulent scheme.

29.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.

30.     Allstate's claim for compensatory damages includes: (1) payments made by Allstate to the Defendant Medical Clinics in reliance upon the false representations that they were eligible to receive reimbursement under the Michigan No-Fault Act, (2) treble damages, (3) statutory interest, (4) costs, including but not limited to the costs of claims handling and the cost of investigation to uncover the fraudulent scheme perpetrated by the defendants, and (5) attorney's fees.

31.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that the defendants have no right to receive payment for any previously-denied and/or pending bills submitted to Allstate whereas (1) the defendants billed Allstate for services and treatment that were not reasonably necessary; (2) the defendants

7

engaged in a pervasive pattern and practice of submitting false medical documentation through the U.S. Mail demanding payment from Allstate; and (3) the defendants billed Allstate for unlawful treatment that was designed and implemented solely to increase their profits.

32.     As a result of the defendants' fraudulent acts, Allstate has paid in excess of $552,818 to them related to the patients at issue herein.

## II.   **THE PARTIES**

### A.   **PLAINTIFFS**

33.     Allstate Insurance Company and Allstate Property and Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois.

34.     Allstate Insurance Company and Allstate Property and Casualty Insurance Company have their principal places of business in Northbrook, Illinois.

35.     Esurance Insurance Company and Esurance Property and Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Wisconsin.

36.     Esurance Insurance Company and Esurance Property and Casualty Insurance Company have their principal places of business in San Francisco, California.

37.    At all times relevant to the allegations contained in this Complaint, each of the plaintiffs was authorized to conduct business in the State of Michigan.

**B.    DEFENDANTS**

**1.    Summit Physicians Group, PLLC**

38.    Summit Physicians Group, PLLC is a Michigan professional limited liability company that was organized on or about December 12, 2011.

39.    Summit Physicians Group's principal place of business is located in Dearborn Heights, Michigan.

40.    Jankowski, Lerner, Crawford, and Giancarlo have or had ownership interests in Summit Physicians Group during the time period at issue herein.

41.    Summit Physicians Group also operated under the assumed name Summit Visiting Physicians Group from February 21, 2012 until April 2, 2015.

42.    Summit Physicians Group billed Allstate for treatment that was not provided, medically unnecessary treatment (to the extent treatment was rendered at all), and engaged in fraudulent billing practices relating to several Allstate insureds, including the patients set out in Exhibit 3.

**2.    Summit Medical Group, PLLC**

43.    Summit Medical Group, PLLC is a Michigan professional limited liability company that was organized on or about April 27, 2010.

44.     Summit Medical operates out of Clinton Township, Michigan and Dearborn, Michigan.

45.     Jankowski is the managing member of Summit Medical.

46.     Summit Medical also operated under the assumed name Summit Visiting Physicians Group from May 24, 2012 until April 2, 2015.

47.     Summit Medical billed Allstate for treatment that was not provided, medically unnecessary treatment (to the extent treatment was rendered at all), and engaged in fraudulent billing practices relating to several Allstate insureds, including the patients set out in Exhibit 4, from February 6, 2013 to present.

### 3.     Summit Diagnostic Services, PLLC

48.     Summit Diagnostic Services, PLLC is a Michigan professional limited liability company that was organized on or about November 19, 2012.

49.     Summit Diagnostic's principal place of business is located in St. Clair Shores, Michigan.

50.     Giancarlo is the managing member of Summit Diagnostic.

51.     Summit Diagnostic billed Allstate for medically unnecessary MRI scans relating to several Allstate insureds, including the patients set out in Exhibit 5.

### 4.   Greater Detroit Physical Therapy & Rehabilitation, P.C. d/b/a Merriman Physical Therapy and Rehabilitation, Inc., Oak Park Physical Therapy, and Warren Physical Therapy and Rehabilitation, P.C.

52.   Greater Detroit Physical Therapy & Rehabilitation, P.C. is a professional corporation that was incorporated on or about April 13, 1994.

53.   Greater Detroit PT operates under the assumed names of Merriman Physical Therapy and Rehabilitation, Inc., Oak Park Physical Therapy, and Warren Physical Therapy and Rehabilitation, P.C.

54.   Greater Detroit PT operates out of Oak Park, Michigan; Warren, Michigan; and Westland, Michigan.

55.   Lerner is the owner of Greater Detroit PT.

56.   Greater Detroit PT billed Allstate for treatment that was not provided, medically unnecessary treatment (to the extent treatment was rendered at all), and engaged in fraudulent billing practices relating to several Allstate insureds, including the patients set out in Exhibit 6.

### 5.   David Peter Jankowski, D.O.

57.   David Peter Jankowski, D.O. is a resident and citizen of the State of Michigan.

58.   Jankowski is a licensed doctor of osteopathic medicine in the State of Michigan.

11

59.     Jankowski is the listed organizer of both Summit Physicians Group and Summit Medical.

60.     At all times relevant to this Complaint, Jankowski controlled and had ownership interests in Summit Physicians Group, Summit Medical, and Summit Diagnostic.

61.     Jankowski rendered medically unnecessary treatment to several of the patients at issue in this Complaint including patients listed in Exhibits 3 and 4.

**6.     Laran Johnathon Lerner, D.O.**

62.     Laran Johnathon Lerner, D.O. was a resident and citizen of the State of Michigan who is currently imprisoned at the Federal Correctional Institution in Morgantown, West Virginia.

63.     Lerner was a licensed doctor of osteopathic medicine in the State of Michigan until his license was suspended in March 2016.

64.     Lerner is the owner of Greater Detroit PT.

65.     For much of the time period at issue herein, Lerner controlled Summit Physicians Group.

66.     For much of the time period at issue herein, Lerner had an ownership interest in Summit Diagnostic.

67.     Lerner rendered treatment to several of the patients at issue in this Complaint, including patients listed in Exhibits 3, 4, and 6.

12

### 7.   **Kevin Crawford, D.O.**

68.   Kevin Crawford, D.O. is a resident and citizen of the State of Michigan.

69.   Crawford is a licensed doctor of osteopathic medicine in the State of Michigan.

70.   At all times relevant to this Complaint, Crawford held an ownership interest in Summit Physicians Group.

71.   At all times relevant to this Complaint, Crawford controlled Summit Physicians Group.

72.   Crawford rendered treatment to several of the patients at issue in this Complaint, including patients listed in Exhibits 3 and 4.

### 8.   **Thomas Giancarlo, D.O.**

73.   Thomas Giancarlo, D.O. is a resident and citizen of the State of Michigan.

74.   Giancarlo is a licensed doctor of osteopathic medicine in the State of Michigan.

75.   Giancarlo is the listed organizer of Summit Diagnostic.

76.   For much of the time period at issue herein, Giancarlo held an ownership interest in Summit Diagnostic.

77.   For much of the time period at issue herein, Giancarlo controlled Summit Diagnostic.

78.     For much of the time period at issue herein, Giancarlo held a financial interest in Summit Physicians Group.  *See* Exhibits 7 and 8.

## III.   JURISDICTION AND VENUE

79.     Jurisdiction over this action is conferred upon this court by 28 U.S.C. §§ 1331 and 1332.

80.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

81.     Allstate Insurance Company and Allstate Property and Casualty Insurance Company are citizens of the State of Illinois for purposes of 28 U.S.C. § 1332.

82.     Esurance Insurance Company and Esurance Property and Casualty Insurance Company are citizens of the States of Wisconsin and California for purposes of 28 U.S.C. § 1332.

83.     Jankowski is a resident and citizen of the State of Michigan.

84.     Lerner is a resident and citizen of the State of Michigan who is currently incarcerated at the Federal Correctional Institution in Morgantown, West Virginia.

85.     Crawford is a resident and citizen of the State of Michigan.

86.     Giancarlo is a resident and citizen of the State of Michigan.

87.     Summit Physicians Group is a professional limited liability company organized under the laws of the State of Michigan.

14

88.     Summit Physicians Group's principal place of business is located in Dearborn Heights, Michigan.

89.     All members of Summit Physicians Group are citizens of and reside in the State of Michigan.

90.     Thus, Summit Physicians Group is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

91.     Summit Medical is a professional limited liability company organized under the laws of the State of Michigan.

92.     Summit Medical's principal place of business is located in Michigan.

93.     Jankowski is the managing member of Summit Medical.

94.     Jankowski is a citizen and resident of the State of Michigan.

95.     Thus, Summit Medical is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

96.     Summit Diagnostic is a professional limited liability company organized under the laws of the State of Michigan.

97.     Summit Diagnostic's principal place of business is located in St. Clair Shores, Michigan.

98.     Summit Diagnostic is owned by Summit Physicians Group.

99.     Thus, Summit Diagnostic is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

100.   Greater Detroit PT is a professional corporation that was incorporated under the laws of the State of Michigan.

101.   Greater Detroit PT's principal place of business is in Michigan.

102.   Thus, Greater Detroit PT is a citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

103.   Further, the amount in controversy, exclusive of interest and costs, exceeds $75,000, the sum set forth in 28 U.S.C. § 1332.

104.   Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue herein were carried out within the Eastern District of Michigan.

## IV.   MICHIGAN'S NO-FAULT ACT

105.   Allstate underwrites automobile insurance in Michigan.

106.   Michigan's No-Fault Act provides for the payment of unlimited medical and rehabilitative benefits on a first-party payor basis for injured victims of motor vehicle accidents.  Mich. Comp. Laws § 500.3107(1)(a).

107.   Personal protection insurance benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services, and accommodations for an injured person's care, recovery, or rehabilitation" arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107(1)(a).

108.   "Under [the No-Fault] statutory scheme, an insurer is not liable for any medical expense to the extent it is not a reasonable charge for the particular product or service, or if the product or service itself is not reasonably necessary." Nasser v. Auto Club Ins. Ass'n, 435 Mich. 33, 49 (1990).

109.   A claimant who seeks to hold an insurer liable for No-Fault benefits has the burden of proving that the service claimed is reasonably necessary and that the charge for the service is reasonable.  Id.

110.   Claims for personal injury benefits under the No-Fault Act are available only if the benefits are for "accidental bodily injury" and only if those injuries "arise[e] out of" or are caused by "the ownership, operation, maintenance or use of a motor vehicle . . . ."  Mich. Comp. Laws § 500.3105(1).

111.   Subject to limited exceptions, an insurer must pay each claim for personal protection insurance benefits arising out of a motor vehicle accident within thirty (30) days after receiving "reasonable proof of the fact and of the amount of the loss sustained."  Mich. Comp. Laws § 500.3142(2).

112.   The Michigan No-Fault Act provides that "[a] physician, hospital, clinic or other person or institution" may only charge a "reasonable amount" for personal injury protection (PIP) benefits for treatment/services which have been "lawfully render[ed]" to an injured person who has sustained bodily injury in an automobile accident.  Mich. Comp. Laws § 500.3157.

17

113.   "If the treatment was not lawfully rendered, it is not a no-fault benefit and payment for it is not reimbursable."  <u>Cherry v. State Farm Mut. Auto. Ins. Co.</u>, 195 Mich. App. 316, 310 (1992).

114.   The Michigan No-Fault Act provides that an insurer "may be allowed by a court an award of reasonable sum against a claimant as an attorney's fee for the insurer's attorney in defense against a claim that was in some respect fraudulent or so excessive as to have no reasonable foundation."   Mich. Comp. Laws § 500.3148(2).

115.   As alleged in this Complaint, the defendants violated Michigan's No-Fault Act by submitting, or causing to be submitted, bills to Allstate seeking reimbursement for services and treatments that were not actually provided; were not reasonably necessary for the care, recovery, or rehabilitation of the defendants' patients; and were not lawfully rendered.

## V.   DEFENDANTS' FRAUDULENT SCHEME

116.   The defendants' scheme to defraud was comprehensive and is well documented.

117.   Indeed, as set out below, the defendants' fraud is confirmed by their own admissions and communications, including numerous emails, sworn testimony, and Lerner's criminal proceedings.

118.   This documentary and testimonial evidence establishes that (a) the defendants admittedly utilized a predetermined treatment protocol that did not take into account medical necessity, (b) the defendants obtained patients from laypersons and as a result of *quid pro quo* relationships, and not because patients actually required treatment, and (c) Lerner and Greater Detroit PT billed for unnecessary office visits, diagnostic testing, and prescription medications, as detailed in the criminal healthcare fraud charge to which Lerner pleaded guilty.

## A.   PREDETERMINED TREATMENT PROTOCOL

119.   Several emails by and between the defendants and third parties unequivocally demonstrate that the defendants utilized an unlawful predetermined treatment protocol.

120.   In an April 19, 2011 email, Jankowski laid out to several parties exactly what treatment the defendants would subject all patients to: "PT, PT post of [sic], MRI, x-ray EKG nerve conduction studies, VNG." *See* Exhibit 1.

121.   Jankowski also stated in the email the reason why these treatments would be used on all patients, as these "services can make a very profitable number for all involved and the numbers are staggering and well worth the effort." Id.

122.   Specific to MRIs, Jankowski noted that "the ability to bill for the machine is the ultimate goal for all involved" and further that "to capture the Auto rates [for MRIs] is necessary for all involved." Id.

19

123.   Jankowski's email setting out the treatment protocol makes no mention of medical necessity or any patient-specific considerations.

124.   Instead, Jankowski sets out a predetermined treatment protocol that, in his own words, "make[s] a very profitable number for all involved."  Id.

125.   Jankowski also sent emails regarding the MRI machine that the defendants were acquiring (resulting in the establishment of defendant Summit Diagnostic) setting out the number of MRIs each doctor/clinic was expected to refer for, including 200 referrals per month from Summit Medical Group, 160 referrals per month from Lerner, and 120 referrals per month from Crawford.  *See* Exhibit 9.

126.   Jankowski further noted that "1800-pain 800" and "US lawyers" – both hotlines that solicit motor vehicle accident victims – would provide "300 [per] month" in additional MRI referrals to Summit Diagnostic.  Id.

127.   Again, necessity and patient-specific considerations were not a part of the conversation regarding the number of MRIs for which the defendants would refer and bill to Allstate.

### B.   *QUID PRO QUO* RELATIONSHIPS

128.   The defendants benefitted from several *quid pro quo* relationships, including with laypersons, solicitation hotlines, and other providers.

129.   As with their predetermined treatment protocol, the defendants' method of obtaining patients did not include considerations of medical necessity.

130.   For example, a former colleague of Jankowski's stated under oath that "I asked Doctor Jankowski several times about his referral sources, and he stated that he got them from many lawyers . . . ."

131.   Jankowski also had documented *quid pro quo* relationships with other medical providers.

132.   For example, Luis Jorge, M.D. sent Jankowski an email dated August 9, 2011, in which he wrote: "David, How come you don't sent me MRI cases but you ask me for free ones?  I believe that if we are going to be partners some day (without putting any money) you should be sending me alot [sic] of patients to protect my economical status." *See* Exhibit 2.

133.   Jankowski responded to Jorge's email, stating: "Luis, I will send you patients tomorrow how many you want?" Id.

134.   Jorge responded to Jankowski, stating: "Show me what you can do for me (4-6 weeks)." Id.

135.   Both Jankowski and Jorge promised each other patients without a single reference to or discussion of patient need and the propriety of treatment.

136.   Upon information and belief, Crawford was also included on the Jankowski-Jorge chain of emails in Exhibit 2.

137.   In an email exchange between Michael Angelo ("Angelo") and Jankowski, Angelo (a layperson) tells Jankowski that "We cannot afford to refer

patients to doctors/facilities/medical groups who do not refer work back to us anymore. We need to work with doctors/facilities/medical groups that will send work to you and Dr. Sabit." *See* Exhibit 10.

138. The defendants also utilized hotlines that solicited motor vehicle accident victims.

139. In an email exchange between Jankowski and Angelo, Jankowski complains that "Summit during the month of July received minimal if any referrals from 1-800-US lawyer." Id.

140. In a separate email in which Jankowski tallies up the large number of MRIs that Summit Diagnostic will bill for with the aid of referrals from Lerner, Crawford, Summit Medical, and others, Jankowski states that "a commitment from 1800-pain 800 or US lawyers of which should be 300 [MRIs per] month." *See* Exhibit 9.

141. As all of the above demonstrate, the defendants participated in numerous *quid pro quo* relationships that derived profit for themselves without regard for the necessity and lawfulness of medical treatment.

## C. CRIMINAL PROCEEDINGS

142. The defendants' fraudulent scheme is further confirmed by Lerner's recent guilty plea to charges of committing healthcare fraud.

143.   In 2015, Lerner was charged by the United States of America with committing healthcare fraud in violation of 18 U.S.C. § 1347 and avoiding reporting requirements in violation of 31 U.S.C. § 5324(a)(3) related to the "treatment" he rendered at Greater Detroit PT.  United States v. Lerner, 15-cr-20511-VAR-RSW (E.D. Mich.) at Docket No. 22.

144.   The Information specifically states that Lerner/Greater Detroit PT billed for "a variety of unnecessary prescriptions, tests, and office visits to make it appear as though he was providing legitimate medical services and prescription medications, when in fact he was dispensing medically unnecessary controlled substances to drug-seeking Medicare beneficiaries."  Id. at ¶ 2.

145.   The Information continues: "It was the purpose of the scheme or artifice for DR. LERNER and his accomplices to unlawfully enrich themselves by, among other things: a) submitting or causing the submission of false and fraudulent claims to health care benefit programs; b) concealing the submission of false and fraudulent claims to health care benefit programs; and c) diverting fraud proceeds for his personal use and benefit of themselves and others."  Id. at ¶ 13.

146.   On August 31, 2015, Lerner entered into a Plea Agreement with the government whereby he pleaded guilty to both counts of the Information.  United States v. Lerner, 15-cr-20511-VAR-RSW (E.D. Mich.) at Docket No. 26.

147.   On February 23, 2016, the government filed its Memorandum in Aid of Sentencing wherein it detailed the scheme by which Lerner/Greater Detroit PT "st[ole] millions of dollars from the Medicare program."  United States v. Lerner, 15-cr-20511-VAR-RSW (E.D. Mich.) at Docket No. 31, p. 2.

148.   A medical assistant from Lerner's office stated that "drivers brought 'truck loads' of patients to the office for narcotic prescriptions and that she saw Dr. Lerner pay the drivers in cash."  Id. at p. 3.

149.   The Sentencing Memorandum also devotes an entire section to Lerner's billing for unnecessary office visits, including specific examples showing that Lerner "1) quickly ask[ed] the patients questions about whether they are in pain and then dictating various diagnoses that were not supported by his examination; 2) order[ed] the patient to undergo an unnecessary nerve conduction test (a painful diagnostic test that is also very expensive); and 3) c[ame] back into the room to prescribe a variety of name brand drugs and pain killers."  Id. at p. 7.

150.   "Sign in sheets from Dr. Lerner's clinic located on Merriman Road in Detroit [i.e., defendant Greater Detroit PT] also show that his office visits were a sham.  For instance, these sign in sheet [sic] reveal that that [sic] he purportedly saw 100 patients in a typical day.  However, Medicare claims data shows that Dr. Lerner billed Medicare for office visits lasting between 10 and 20 minutes.  As a result, if

he billed only 10 minute office visits, it would have taken him over <u>16 hours</u> to perform office visits with 100 patients." <u>Id</u>. at pp. 7-8 (emphasis original).

151.   The Sentencing Memorandum also discusses the unnecessary electrodiagnostic testing Lerner ordered without regard for patient need (and, in one instance, ordered again even though the first nerve conduction study triggered a seizure in the patient).  <u>Id</u>. at p. 8.

152.   The Sentencing Memorandum concludes that "Dr. Lerner routinely put his own interests ahead of his patients' interests" and that "Dr. Lerner's conduct to date shows a contempt for the law and an unwillingness to stop committing health care fraud." <u>Id</u>. at pp. 15, 17.

153.   Lerner was sentenced in March 2016 to 45 months' imprisonment, and was ordered to pay restitution of $2,789,409.00.  <u>United States v. Lerner</u>, 15-cr-20511-VAR-RSW (E.D. Mich.) at Docket No. 37.

154.   The rampant fraud admitted by Lerner in his criminal proceedings is the same fraud that was perpetrated on Allstate.

155.   In sworn testimony given to Allstate, Lerner testified:

Q:   When you were working at Summit Physicians Group did you prescribe medically unnecessary and excessive prescription medications?

A:   I'll take the Fifth on that.

25

> Q:      All right.  Doctor, did you prescribe medically
> unnecessary and excessive prescription medications
> from Greater Detroit Physical Therapy and Rehab?
>
> A:      I plead the Fifth.

156.   Lerner further testified that he billed Allstate for the same treatment and

services that he used to defraud Medicare:

> Q:      Okay.  Doctor, during that time period of the fraud
> scheme of Medicare '08 to 2015, did you including
> your clinics, which would be Summit Physicians
> Group and Greater Detroit Physical Therapy, did
> you charge Allstate for services?
>
> A:      Yes.
>
> Q:      Did you, during that time frame did you charge
> Allstate for testing, various testing?
>
> A:      Yes.
>
> Q:      Diagnostic testing?
>
> A:      Yes.
>
> Q:      Okay.  During that time frame and again obviously
> I'm talking about '08 to 2015, the time period
> within which your plea agreement relates to, did
> you including your clinics charge, submit charges to
> Allstate for office visits?
>
> A:      Yes.

157.   Lerner further confirmed that he followed the same protocols for

patients involved in motor vehicle accidents as he did his Medicare patients:

> Q:   Did you follow the same protocols for auto insurance patients as you did for Medicare patients?
>
> A:   Yes.

158.  According to Lerner's own words, the payor of the services did not factor into how he treated a patient; as such, the unnecessary and fraudulent services that Lerner rendered to Medicare patients (and for which he pleaded guilty to healthcare fraud) were also the unnecessary and fraudulent services Lerner rendered to all of his other patients, including those insured by Allstate and at issue in this Complaint:

> Q:   Okay. So you're telling me you don't take into account who's paying the bill when you decide what treatment plan you're going to give a patient; is that what you're testifying to?
>
> A:   Yes.

## VI.  <u>FRAUDULENT AND UNNECESSARY TREATMENT</u>

159.  The defendants' goal in treating patients was to perform as much treatment as possible, regardless of whether such treatment was reasonably necessary to the patients' care, recovery, or rehabilitation, and/or arose out of a motor vehicle accident, in order to generate bills to be submitted to Allstate, as well as to inflate and bolster litigation brought by the attorneys with whom the defendants worked to obtain patients.

160.   A key component of the defendants' "treatment" was to justify disability prescriptions, both to falsely bolster the appearance of a legitimate claim and also as an incentive to keep patients treating with them.

161.   The defendants also plied patients with copious amounts of highly-addictive prescription medication to incentivize them to continue treating.

162.   The defendants' overall aim of billing for as much treatment as possible without regard for medical necessity is confirmed by the predetermined treatment protocol they established and their engagement in unlawful *quid pro quo* relationships and solicitation, as described *supra*.

163.   The defendants' overall aim of billing for as much treatment as possible without regard for medical necessity is further confirmed by Lerner's 2015 criminal guilty plea to healthcare fraud.

164.   None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Allstate by the defendants.

165.   Further, Lerner's criminal proceeding was commenced in June 2015 and resulted in a 45-month sentence and significant restitution order that was issued in March 2016.

166.   In addition to their treatment being unlawful and unnecessary because it resulted from the unlawful obtaining of patients and adhered to a predetermined treatment protocol, the defendants' treatment is also violative of established standards of care in the medical community.

167.   As set out below, the defendants grossly overutilized prescription medications, physical therapy, electrodiagnostic testing, procedures, and MRIs in wanton disregard for standards of care.

168.   The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they allegedly provided was not known to Allstate until it undertook the full investigation that culminated in the filing of this action, including identification of the defendants' pattern of overtreatment.

169.   The unnecessary treatment rendered by the defendants, discussed more fully below, includes, but is not limited to, the treatment and patients set out in the charts annexed hereto at Exhibits 3 through 6.

170.   All of the claims submitted by the defendants to Allstate through the U.S. Mail seeking reimbursement for unnecessary, unlawful, and unreasonable treatment are fraudulent.

171.   None of the fraudulent claims submitted by the defendants are compensable under the Michigan No-Fault Act.

29

172.   Allstate is not required to compensate the defendants for treatment that was rendered based on a predetermined treatment protocol that was not patient-specific, and therefore medically unnecessary, and it is entitled to the return of money paid in reliance on the defendants' fraud.

## A.   DEFENDANTS' OVERALL PATTERN OF FRAUDULENT TREATMENT

173.   In the succeeding sections, Allstate details the numerous problems with the specific types of treatment purportedly rendered by the defendants (e.g., prescription medication, electrodiagnostic testing, procedures, MRIs, et al.).

174.   However, an overview of the defendants' pattern of treatment and the theme of their treatment is helpful to understanding the exact nature of their fraudulent scheme, and the wide-ranging harm that this scheme caused not just to Allstate, but also to the defendants' patients.

175.   The defendants organized around a highly aggressive business model where the overarching theme was to do as much treatment as possible as quickly as possible.

176.   In furtherance of this theme, the defendants falsified and magnified symptoms for almost every patient at issue herein in order to give the appearance that extensive medical treatment was necessary (discussed more fully below).

177.   In addition, the use of potentially addictive controlled medications and disability prescriptions were utilized almost universally by the defendants.

30

178.  These medications and disability certificates were utilized as a means to hook patients into treatment with the defendants and keep them returning, and were also used to give the (false) appearance of more serious injury.

179.  Doctors working at Summit Physicians Group, Summit Medical, and Greater Detroit PT routinely signed disability certificates finding patients to be partially or totally disabled, and restricted the patient's driving, movement, and/or housekeeping activities.

180.  In fact, the defendants restricted driving for almost all of the patients at issue in this Complaint who received disability certificates.

181.  In addition to being highly improbable, in many instances, there is no discussion in the defendants' initial or follow-up examination reports about the patient's specific home activities, driving abilities, work activities, or any other information that would allow Summit Physicians Group, Summit Medical, and Greater Detroit PT to legitimately assess the disabilities of the patient and reasonably necessary accommodations.

182.  The defendants also billed for an extraordinary amount of MRIs and electrodiagnostic testing, usually electromyography (EMG) and nerve conduction studies (NCS), both to (a) reap the financial benefits of billing for this diagnostic testing themselves and (b) attempt to justify their aggressive treatment, including injections.

183.   The overriding pattern in treatment that permeates the defendants' medical records is a marked absence of conservative care in favor of aggressive and expensive treatment.

184.   The defendants also utilized the same types of treatment over and over with little variation and no regard for patient-specific considerations.

185.   The standard of care for medical professionals is that they conduct examinations of their patients and obtain patient histories as part of their initial patient assessment.

186.   The defendants rarely conducted anything more than cursory examinations at best and almost never took patient histories.

187.   To the contrary, the defendants (Jankowski and Lerner in particular) have repeatedly admitted that they do not consider previous and even concurrent treatment when they are treating patients, which is not only violative of the standard of care but also dangerous to the welfare of their patients.

188.   Jankowski and Lerner have also conceded that they do not undertake full examinations, and often could not answer why they made particular diagnoses or recommended certain treatment.

189.   In addition to being below the standard of care, the practice of not obtaining histories and not conducting full exams also calls into question whether the patient's purported injuries were causally related to the motor vehicle accident

(as they must be in order for the defendants to submit bills to Allstate under Michigan's No-Fault Act).

190.   For example, in response to questions related to Patient R.M. (Claim No. 0210760954)[1], a patient at issue in this Complaint, Jankowski testified:

> Q:   I see that in part of your assessment you diagnosed bilateral shoulder joint arthralgia, but your exam seems to be normal.  So why do you diagnose that?
>
> A:   I am not certain why.

191.   Patient R.M. was allegedly involved in a motor vehicle accident in July 2011 but did not see Jankowski until October 2012.

192.   According to medical records submitted to Allstate, Patient R.M. presented to a medical doctor in August of 2011 complaining of back pain on her left side.

193.   Her treating physician at the time performed a physical exam that was unremarkable for radiculopathy and Patient R.M. was advised her back pain "should take care of itself in six to eight weeks and get better."

194.   When questioned further under oath about how the bilateral shoulder joint arthralgia was connected to the motor vehicle accident, Jankowski testified:

> Q:   Well, were you aware or do you have anything in your history that showed – I mean she indicated that she had to travel back to Lebanon, and she did that

_____

[1] To protect the confidentiality of its insureds, Allstate hereinafter refers to each by his or her initials and Allstate claim number.

soon after going to her U of M doctor; came back in December of 2011 and then had to turn around and go back and spent the next nine months over there. So she had been in Lebanon for the bulk of time until the end of September of 2012 and then you see her in October.

That's what I'm just wondering because when you see her, and all you have is the U of M thing saying, 'Hey, you have a back strain. You should be better in six to eight weeks,' and then she's out of the country for about a year and then she comes back and has all these things. I'm wondering how all of this is connected to the accident.

A:    You know, there is some – because of the travel abroad and long duration travel abroad, it makes it very difficult to really know what, if there was anything that happened over there. It's hard to elicit any information. I don't know what to make of it.

195.   Lerner also confirmed that he almost never reviews a patient's medical history or attempted to obtain a patient's records from his/her primary care physician prior to beginning treatment:

Q:    All right. So there's times where you're going to be rendering treatment before or without ever having received primary care physician records for a patient?

A:    Well, we almost never have the -- we almost never have the records before we start treating the patient. I'd say almost 99 percent or 100 percent of the patients, probably 99 percent of the patients we treat with we're not able to get the medical records when we start treatment, that's correct.

34

> Q:    Okay, but you treated, for example, you allegedly treated [Patient N.D.] for over a year from May to May.  Let's see here, and at no point in that, during that entire timeframe did you get her primary care physician records; is that right?
>
> A:    Correct.

196.   In fact, Jankowski and Lerner often saw the same patients contemporaneously without any knowledge the other was providing substantially similar treatment or that the patient had a prior history of pain.

197.   Jankowski testified that Lerner failed to indicate that Patient T.B.'s (Claim No. 0318113016) "injuries" were the result of a motor vehicle accident:

> Q:    So he goes in to [Lerner] complaining about low back pain radiating into his right leg and then he's complaining about stress, anxiety and depression, correct?
>
> A:    Yes.
>
> Q:    Then he [sic] diagnosis or [Lerner's] impression is lumbar myositis, stress, anxiety, depression, erectile dysfunction.  And [Lerner] prescribes him Norco, Soma, Cialis, Benadryl, Ultram, Zocor, is it Brentalex and Greylees?
>
> A:    Yes.
>
> Q:    You'll agree with me at least in that narrative that you see right there that there is no mention that it's as a result of an accident or anything like that, correct?
>
> A:    It does not mention one bit of it.

198.   Jankowski further testified:

> Q:   Do you remember when you first became aware of the fact that [Patient T.B.] had some preexisting problems when he came to see you?
>
> A:   I can't.  It was probably, he's been seeing us now for a year, right?  So maybe four months ago.  6 months ago.
>
> Q:   How did you find out about that?
>
> A:   I think he was seeing one of the partners.  Doctor Lerner.

199.   In fact, Patient T.B. presented to Lerner prior to his motor vehicle accident:

> Q:   If you look at Lerner's visit from February 13, this would have been his last visit prior.  This is before the accident. February 13. So that would have been his last visit before he was involved in the motor vehicle accident that he then is giving you a history of.
>
> And he's complaining about his low back pain radiating into his right leg and the same stress, anxiety, depression.  Correct?
>
> A:   That's correct, yes.

200.   Crawford also testified that he does not communicate with other physicians who are also treating the patient at Summit Physicians Group or Summit Medical:

> Q:   If you intend for a patient who is being treated by the Summit Group to discontinue a therapy that

> another physician in your group has ordered, how
> do you communicate that to the other physician?
> Do you leave it up to the patient, do you call, in this
> situation, Dr. Lerner?  How does that work?

A:     Pretty much we would leave that up to the patient.

201.   Crawford's attempt to shift his responsibility of providing sound medical care to the same patients for whom he swore an oath to do no harm to by testifying that it is the patient's responsibility to advise a licensed medical professional that another licensed medical professional, from the same medical clinic, is treating the patient, is well below the standard of care.

## B.     DEFENDANTS EXAGGERATED SYMPTOMS AND DIAGNOSES TO FALSELY JUSTIFY TREATMENT

202.   Almost all of the patients at issue in this Complaint were found to have significant symptom magnification and differences in presentation of symptoms when comparing emergency room/primary care physician evaluations to the initial evaluation at Summit Physicians Group, Summit Medical, and Greater Detroit PT.

203.   For example, the emergency room/primary care records almost always indicate a low-level motor vehicle accident and that the patient suffered a minor, fairly localized injury, whereas the defendants' medical records for the same patients indicate that a high-speed accident occurred and that patients were more seriously injured.

204.   The phrases "hit hard and fast," "jarred," and "patient was thrown around the vehicle" appear at a highly implausible (indeed, almost comical) rate in the defendants' records.

205.   The defendants also frequently used other exaggerated language to describe patients' symptoms and accidents, such as "severe," "multi-level," "intractable," "post-traumatic," and "traumatically-induced."

206.   The use of such exaggerated adjectives to describe the patients' conditions is often in stark contrast to the documentation of other providers who treated patients post-accident.

207.   Similarly, the defendants' patient problem lists are often extensive, listing at times a dozen different purported issues instead of one or two unifying diagnoses.

208.   The defendants also magnified diagnoses in an attempt to justify their unnecessary treatment.

209.   As one example, the defendants often diagnosed cervical dystonia when cervical muscle strain was the accurate diagnosis.

210.   The use of more severe diagnoses often preceded the use of invasive therapy by the defendants, thereby confirming that the defendants inflated symptoms and diagnoses to falsely justify aggressive treatment.

211.   Symptom and diagnosis magnification was universal in the records of the patients at issue herein, confirming that the defendants intentionally misrepresented their patients' injuries.

212.   By way of example, Patient M.F. (Claim No. 0257606574) presented to Oakwood Hospital and Medical Center on September 4, 2012 after her alleged motor vehicle accident.

213.   The medical records submitted to Allstate from Oakwood Hospital and Medical Center for September 4, 2012 unequivocally state that "there was no blow to the head" and no "loss of vision."

214.   However, when Patient M.F. presented to Summit Medical on December 20, 2012, Jankowski noted in her initial evaluation that "she did strike her head on the steering wheel" and has "visual disturbances due to traumatic event[.]"

215.   The defendants' symptom and diagnoses magnification is also confirmed by the Lerner criminal proceedings.

216.   Government Special Agent Steven Warren "participat[ed] in an investigation pertaining to the submission of false and fraudulent claims to Medicare for prescription drugs and medical services that were not provided and/or not medically necessary by Dr. Laran Lerner."   *See* Exhibit 11 at ¶ 4.

217.   According to the Affidavit filed by Special Agent Steven Warren, "[o]n two separate occasions, once in January 2014 and once in January 2015, a

[Confidential Human Source] accompanied Medicare beneficiaries to Lerner's office and recorded the visits with Medicare patients MH and HW at Lerner's office at the 22100 Greenfield Road location." Id. at ¶ 54.

218. "Both recordings show Lerner: 1) quickly asking the patients' questions about whether they are in pain, **dictating various diagnoses that aren't supported by an examination** to the nurse in the room; 2) making the patient undergo a nerve conduction test, and; 3) coming back into the room to prescribe a variety of name brand drugs and pain killers." Id. at ¶ 55 (emphasis added).

219. Lerner and the other individual defendants engaged in a similar scheme to defraud Allstate by falsely justifying diagnoses and performing medically unnecessary treatment just as Lerner did when he admittedly defrauded Medicare.

### C. UNNECESSARY AND EXCESSIVE PRESCRIPTION MEDICATION

220. The defendants provided patients with a slew of prescription narcotics and various other medically unnecessary medications upon each patient's presentment to Summit Physicians Group, Summit Medical, and Greater Detroit PT, regardless of each individual patient's medical needs and clinical history.

221. As discussed above, the defendants used the promise of prescription drugs to lure in and keep patients.

222. Lerner has admitted to this practice, as he conceded that he "entered into a scheme to defraud Medicare by luring patients to the Greenfield Road Clinic

with prescriptions for unnecessary controlled substances." United States v. Lerner, 15-cr-20511-VAR-RSW (E.D. Mich.) at Docket No. 26, p. 4.

223.   Lerner, who knew his "patients were vulnerable to addiction," set out on his scheme to defraud Medicare "by luring drug-addicted patients into his office with narcotics and other controlled substances." United States v. Lerner, 15-cr-20511-VAR-RSW (E.D. Mich.) at Docket No. 31, p. 2.

224.   Lerner further admitted that he "billed and caused Medicare to be billed for a variety of unnecessary prescriptions, tests, and office visits to make it appear as though he was providing legitimate medical services instead of medically unnecessary controlled substances." United States v. Lerner, 15-cr-20511-VAR-RSW (E.D. Mich.) at Docket No. 26, p. 4.

225.   "Dr. Lerner's conduct lead to addiction in his own patients and allowed narcotics to enter the underground market for prescription drugs in Detroit." United States v. Lerner, 15-cr-20511-VAR-RSW (E.D. Mich.) at Docket No. 31, p. 14.

226.   The defendants not only illegally billed Allstate for unnecessary medications, they did so at the expense of the care and safety of their patients.

227.   "The rate of death from prescription drug poisoning in Michigan has quadrupled since 1999.  In particular, opioids (i.e., narcotics like hydrocodone) and benzodiazepines (i.e., anti-anxiety medications like Xanax) – the same drugs Dr.

Lerner used to lure patients – were involved in a large number of Michigan's prescription overdose deaths." Id. at p. 13.

228.   The Centers for Medicare & Medicaid Services ("CMS") recently released its Medicare Provider Utilization and Payment Data: Part D Prescriber Public Use File (PUF) that contains information on prescription drugs prescribed by individual physicians and other health care providers.

229.   According to CMS's data, Jankowski prescribed 32,763 days' worth of Hydrocodone to 270 Medicare beneficiaries and 21,337 days' worth of Alprazolam (Xanax) to 176 Medicare beneficiaries in 2014 alone.

230.   According to an office manager who worked for Lerner, "Dr. Lerner prescribed narcotics to everyone who came into his clinic" and "Dr. Lerner prescribed medically unnecessary narcotics even when his patients were receiving narcotic prescriptions from multiple doctors in the Detroit area to feed their addictions."

231.   This same office manager "explained that, although he has no medical background, he [the office manager] would often go back to the patient charts and write in the necessary diagnosis to support billing the laundry list of medications prescribed by Dr. Lerner."

232.   As a matter of course, Summit Medical Group, Summit Physicians Group, Greater Detroit PT, Jankowski, and Lerner often prescribed and dispensed

opioids and other highly addictive narcotics to patients without even asking the patient if he/she was currently on any medication.

233.  Jankowski testified:

> Q:   And whatever medications you prescribed that is solely based on his subjective history to you that he's not taking any other medication.  So you wouldn't know if something you're prescribing on this day could be interacting with something because you believe he's not taking any kind of medications, correct?
>
> A:   That's correct.

234.  Jankowski provided testimony relating to the medications prescribed and dispensed to Patient T.B. (Claim No. 0318113016) that demonstrate the prescription medications were dispensed *pro forma* and without proper patient follow up:

> Q:   When you see [T.B.] on the 22nd you prescribe him a lot of narcotics and more muscle relaxants.  So is he taking all of them do you know?
>
> A:   Honestly, I don't know.

235.  Jankowski further admitted that patients under his care received highly addictive medications from other doctors:

> Q:   Do you have any idea why within 8 days of you seeing him and prescribing him these kind of medications that he would be getting Hydrocodone from another doctor?

A:    You know, I think at this point he is seeing another doctor.

Q:    Yeah.

A:    A prescription issue date and fill date was 5-1?

Q:    Yeah.  Do you have any idea why he would be getting Hydrocodone from you and then from another doctor days later?

A:    I don't have any idea.

236.    According to Jankowski, even when other doctors prescribed and dispensed highly addictive narcotics to his patients, he continued to dispense medications that were even stronger:

Q:    Lerner prescribes Norco on April 9, 2014. So would [T.B.] be violating his agreement with you because another doctor with your practice is prescribing the drug for him?

A:    Obviously, [T.B.]'s not being accurate.  An accurate compliant.  Whoever wrote the scrip [sic] for him on the Norco, whether it's Lerner or this other guy.

Q:    But when you confront [T.B.] with that he wouldn't tell you Doctor Lerner gave it to me?  He just is dishonest about the situation?

A:    I'm afraid so, yes.

Q:    So then you give him Percocet, which is even stronger than the Norco?

A:    Yes.

237.    In addition to the highly addictive opioids and other narcotics frequently prescribed and dispensed by Summit Medical Group, Summit Physicians Group, Greater Detroit PT, Jankowski, and Lerner, patients at issue in this Complaint were also prescribed and dispensed medications that were unnecessary as they were not related to the motor vehicle accident and/or dispensed without any medical justification provided in the medical record.

238.    For example, Jankowski testified that he prescribed medication without documented clinical need, but rather "just in case":

> Q:    So you don't know if he has any kind of problems with anything because you're just prescribing it for the very first time this day but it's more of a hey, if you do this, it will prevent you from having it?
>
> A:    Yeah.

239.    Jankowski also testified he prescribed and dispensed Cialis, which is for erectile dysfunction and is not related to a motor vehicle accident notwithstanding the bill submitted to Allstate.

240.    Furthermore, Jankowski testified:

> Q:    How about Zocor?  That's for cholesterol, isn't it?
>
> A:    Yup.

241.    Jankowski further confirmed dispensing medically unnecessary medications to a patient at issue in this Complaint:

> Q:    What is the Prilosec for?

45

A:    The Prilosec is typically used to decrease the amount of acid reflux you have. We had asked her if she needed Motrin. I think she had Motrin. She was -- previous to the accident she was taking her own Motrin over the counter. Typically when you have an accident and you have any type of insult, with stress comes increased production of hydrochloric acid. The more hydrochloric acid, you can have an iatrically induced gastric ulcer and bleeding, so it's kind of a prophylactic measure and –

Q:    So you don't wait to see if they're having any kind of problems, you just prescribe it ahead of time?

A:    Yeah.

242.   In other words, Summit Medical Group, Summit Physicians Group, Greater Detroit PT, Jankowski, and Lerner prescribed and dispensed prescription medications that were based on an "in case you need it" assessment instead of actual need.

243.   Jankowski has already pleaded no contest to charges of negligent delegation of schedule 2 controlled substances to a nurse practitioner in his office. *See* Exhibit 12.

244.   The lack of necessity of the defendants' excessive and dangerous drug prescriptions is further demonstrated by the fact that Lerner and Greater Detroit PT received kickbacks from pharmacies for prescriptions.

245.    "Medicare Patient S.R. told agents that Dr. Lerner instructed her to fill her prescriptions at Advanced Pharmacy Services, the pharmacy located in the same office building as Dr. Lerner's clinic.  S.R. took her prescriptions from Dr. Lerner's office, but only collected her controlled substance prescriptions and some maintenance medications.  The employees at Advanced Pharmacy Services paid S.R. cash for her unwanted prescriptions from Dr. Lerner and billed Medicare as if they dispensed the medications."  United States v. Lerner, 15-cr-20511-VAR-RSW (E.D. Mich.) at Docket No. 31, pp. 5-6.

246.    The owner of Value Pharmacy, located next to Lerner's clinic in Detroit, "told agents that he paid Dr. Lerner a $1,500 cash kickback every month to get Dr. Lerner to send him prescriptions."  Id. at p. 6.

247.    Even after his 2015 arrest, "[Lerner] is still attempting to see patients and prescribe under other physicians' numbers."  Id. at pp. 16-17.

248.    During Lerner's sentencing hearing, the Honorable Judge Victoria A. Roberts stated, "[t]he word 'prey' is not too strong, because it is the addicted, the sick, and the elderly, people from the city who end up being prescribed narcotics when they don't need it" when sentencing Lerner.  See Exhibit 13 at p. 54.

### D.   UNNECESSARY AND EXCESSIVE PHYSICAL THERAPY

249.    The physical therapy prescribed by the defendants also violated established standards of care.

250.   Physical therapy must be objectively indicated.

251.   That is, a patient's subjective complaints of pain are not sufficient to justify more than a few weeks of physical therapy.

252.   However, Summit Physicians Group, Summit Medical, Greater Detroit PT, Jankowski, and Lerner often prescribed extensive physical therapy based upon a patient's subjective symptoms alone.

253.   These defendants routinely reported essentially normal findings in patient examinations yet entered diagnoses unsupported by the physical exam that purported to justify extensive physical therapy.

254.   In fact, the defendants' physical exams and findings for each patient were strikingly similar, indicating that the exams were *pro forma* and merely attempts to justify unnecessary treatment, instead of an attempt to identify each patient's unique symptomology and clinical needs.

255.   Summit Physicians Group, Summit Medical, Greater Detroit PT, Jankowski, and Lerner played an indispensable role in the defendants' ability to refer for excessive physical therapy as, under Michigan law for dates of service before January 1, 2015, physical therapy had to be prescribed by an individual licensed to practice dentistry, medicine, osteopathic medicine and surgery, or podiatric medicine and surgery.  Mich. Comp. Laws § 333.17820(1).

256.   Jankowski and Lerner repeatedly made misrepresentations regarding the necessity for physical therapy, including almost every time each wrote a prescription for physical therapy, in order to perpetuate unnecessary and expensive treatment.

257.   These false statements, including Jankowski's and Lerner's prescriptions for physical therapy, were submitted to Allstate through the U.S. Mail along with demands for payment.

258.   Jankowski and Lerner typically wrote the physical therapy prescription during the initial evaluation for each patient at issue in this Complaint.

259.   In approximately 90% of all motor vehicle accident cases, mild injuries will resolve by themselves within a few weeks without any treatment whatsoever.

260.   This fact supports that immediate resort to physical therapy, as often happened due to primarily Jankowski and Lerner providing physical therapy referrals as a matter of course, was not related to the care, recovery, or rehabilitation of the patient, thus rendering such physical therapy medically unnecessary and not compensable under Michigan's No-Fault Act.

### E.   UNWARRANTED ELECTRODIAGNOSTIC TESTING

261.   The defendants billed for a significant number of unnecessary and excessive electrodiagnostic tests allegedly performed on the patients at issue herein.

262.   Electrodiagnostics is the branch of medicine that measures electrical potentials from nerves and muscles to determine if there is inherent pathology.

263.   Electrodiagnostic testing includes electromyography ("EMG") and nerve conduction studies ("NCS").

264.   EMG testing involves the use of an electromyography machine to record the electrical activity of a skeletal muscle to evaluate the existence of muscle and/or nerve abnormalities.

265.   An EMG is an invasive procedure that involves the insertion of a small needle electrode directly into an individual muscle.

266.   There are at least two components to a properly administered EMG test.

267.   First, after the needle is inserted below the skin, the muscle is examined at rest.

268.   In a normal muscle at rest, there is some reaction to the muscle when the needle is first pushed through the surface of the muscle and then the muscle becomes "silent."

269.   A damaged muscle – or a muscle that has experienced disruption of its normal nerve stimulation, as occurs in neuropathy or radiculopathy – continues to produce electric charges even at rest.

270.   The second component of the EMG test measures the electrical activity that occurs when the muscle is activated by a motor nerve.

271.   In a healthy muscle, a voluntary muscle movement produces a measurable electrical charge.

272.   If the nerve or root has been damaged, then some part of the muscle signal may be missing or abnormal.

273.   To perform a NCS, the clinician must measure nerve impulses following nerve stimulation and obtain information regarding the speed (i.e., velocity), timing, and strength (i.e., amplitude) of nerve impulses.

274.   NCS involve non-invasive tests in which peripheral nerves in the upper and lower limbs (i.e., arms and legs) are stimulated through the skin by the application of an electrical current.

275.   A brief shock is then delivered at a measured distance from the recording electrodes to stimulate the nerve, causing it to conduct an electrical wave of depolarization down each respective nerve.

276.   The velocity, amplitude, and shape of the response are then recorded by the recording electrodes attached to the surface of the skin.

277.   The electrical characteristics of the nerve responses are compared with well-defined normal responses to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers of peripheral nerves in the arms and legs.

278.   The results of the EMG and NCS testing referred for and performed by Summit Physicians Group, Summit Medical, Greater Detroit PT, Jankowski, and Lerner reflect predominantly unjustified testing resulting in a pattern of excess testing and unwarranted – and sometimes impossible – findings.

279.   The electrodiagnostic testing referred and performed by these defendants was unnecessary and problematic in several respects.

280.   First, such testing was not warranted or indicated based on the referring physician defendants' own findings and each patient's symptoms.

281.   Second, the electrodiagnostic testing that was done was excessive, was not likely performed as billed, and the results of which contain unsupported and incredible results.

282.   Finally, the EMG and NCS that were billed did not in any way affect patient treatment, thus rendering them clinically useless.

283.   The numerous problems with the defendants' electrodiagnostic testing, discussed in detail below, are confirmed by Lerner's criminal proceeding, in which he admitted that part of his scheme to defraud Medicare involved billing for medically unnecessary electrodiagnostic testing.

284.   During the investigation into Lerner's fraudulent scheme, Lerner was recorded telling one Medicare beneficiary that the beneficiary "had to have nerve conduction studies on his/her arms and legs at each appointment and that, if he/she

didn't want it on the next visit, they could just perform the test more 'gently.'" *See* Exhibit 11 at ¶ 58.

285.   As mentioned *supra*, even when one of the nerve conduction tests ordered by Lerner "triggered a seizure" in one of his patients, Lerner "simply ordered the test again the next time the patient came to his office." United States v. Lerner, 15-cr-20511-VAR-RSW (E.D. Mich.) at Docket No. 31, p. 8.

286.   A similar situation occurred relating to a patient at issue in this Complaint.

287.   Patient S.L. (Claim No. TXA0125744) was involved in a motor vehicle accident on January 6, 2014.

288.   S.L. presented to the emergency room of Oakwood Hospital and Medical Center on January 6, 2014 with a complaint of "moderate" lower back pain resulting from a "low impact" motor vehicle accident.

289.   According to the January 6, 2014 emergency room medical records, S.L. had "no chest pain, no numbness, no visual change, no abdominal pain, patient does not experience disorientation, no loss of consciousness, no tingling and no shortness of breath" and states that the "accident occurred while the vehicle was travelling at a low speed" resulting in "grazing to driver side of vehicle."

290.   S.L. presented to Summit Physicians Group on January 22, 2014 and purportedly received an initial evaluation in which Lerner falsely reported that S.L.

presented with complaints of "neck pain radiating to the left shoulder, mid back pain and low back pain with radiation to the left lower extremity of her toes, headaches, pain in the left knee, and pain in the left shoulder."

291.  According to Lerner's medical record from the initial evaluation purportedly conducted on January 22, 2014, S.L.'s motor vehicle was "hit hard and fast" and subsequently "totaled."

292.  Lerner reported that S.L. "hit her head on the side window"; "thrown side-to-side"; and was "very jarred."

293.  Lerner's findings are contradictory to the findings made during S.L.'s visit to the emergency room on the same date as the motor vehicle accident.

294.  On January 29, 2014, S.L. underwent electrodiagnostic testing performed by Lerner.

295.  According to Lerner's medical record on January 29, 2014, S.L. "had a grand mal seizure while lying on the table and fell from the table to the floor" and for "approximately 2 minutes [S.L.] was seizing."

296.  Lerner nonetheless recommended that S.L. continue treatment.

297.  Summit Physicians Group, Summit Medical, and Greater Detroit PT billed Allstate several hundreds of thousands of dollars for the purported electrodiagnostic testing performed on patients at issue in this Complaint. *See* Exhibits 3, 4, and 6.

298.   Lerner in particular performed much of the electrodiagnostic testing that was done, including at Summit Physicians Group, Summit Medical, and Greater Detroit PT.

### 1.   Unwarranted EMG and NCS Testing Not Supported by Documented Findings

299.   For EMG and NCS testing to be medically justified, the clinical examination must indicate symptoms or signs of radiculopathy.

300.   Radiculopathy is a pathological condition of the nerve roots where one or more root nerves along the spine become damaged causing radiating pain to the part of the body served by the particular nerve.

301.   Essentially, a radiculopathy is what is known as a "pinched nerve."

302.   The patient's subjective symptoms alone cannot support the performance of an electrodiagnostic study absent objective findings by the practitioner because such studies are an extension of the clinical exam.

303.   Conservative treatment should be performed prior to resorting to an invasive procedure such as electrodiagnostic testing.

304.   EMG and NCS studies are reserved for cases of actual neurologic abnormalities.

305.   EMG and NCS are not indicated where, as was the case with almost every patient at issue herein, neurologic deficits are not detected.

306.   Jankowski and Lerner routinely ordered EMG and NCS testing in the absence of any objective findings of abnormal neurology.

307.   If there is no history and physical evidence of a significant radiculopathy, as is the case for almost all of the patients at issue herein, there is nothing to be learned from the EMG that is of clinical significance.

308.   Patients of the defendants underwent EMG and NCS testing even when objective symptoms or signs of radiculopathy were absent from the clinical examination.

## 2.    Motor Vehicle Accidents Rarely Cause Radiculopathy

309.   The absence of objective symptoms and signs of radiculopathy in the patients of Summit Physicians Group, Summit Medical, and Greater Detroit PT is not surprising because the entirety of the patients purported to be injured in motor vehicle accidents.

310.   Motor vehicle accidents only rarely cause neuropathy.

311.   A recently published study examined the frequency of radiculopathy in motor vehicle accident patients.   Randall L. Braddom, et al., Frequency of Radiculopathies in Motor Vehicle Accidents, 39 Muscle & Nerve 545-547 (2009).

312.   The study found that motor vehicle trauma causes a slight increase over the baseline rate of cervical radiculopathy (8%) compared to non-motor vehicle

accident patients (6%), and that the frequency of lumbar radiculopathy in the two populations was the same (12%). Id.

313.   Therefore, cervical radiculopathy is only rarely caused by a motor vehicle accident and motor vehicle accidents do not cause a significant increase in the frequency of lumbar radiculopathy.

314.   Consequently, the lack of objective symptoms and signs of radiculopathy in the patients' medical records is consistent with the documented reality that motor vehicle accidents rarely cause radiculopathies.

### 3.   Electrodiagnostic Testing Was Performed Pursuant to a Predetermined Protocol and Did Not Affect Treatment

315.   The defendants routinely ordered physical therapy and diagnostic tests, including EMG and/or NCS studies, based upon the initial examinations of each patient.

316.   Electrodiagnostic testing is an extension of the clinical exam and should be used, if at all, in accordance with a patient's individualized objective symptoms.

317.   The nature and number of the peripheral nerves and the types of nerve fibers tested in a NCS should be dynamic (i.e., varied from patient to patient), and should never be based on a predetermined protocol.

318.   Likewise, the provision of EMG tests should not be conducted pursuant to a predetermined protocol of muscles to be tested.

319.   Such a protocol-based approach to electrodiagnostic testing can lead to overutilization of such testing, as happened with the defendants here.

320.   Overutilization of invasive electrodiagnostic studies subjects patients to unnecessary pain and exposes them to unnecessary risk for infection.

321.   Summit Physicians Group, Summit Medical, Greater Detroit PT, Jankowski, and Lerner used a protocol approach when submitting their patients to electrodiagnostic testing.

322.   The *pro forma* nature of these defendants' referrals for electrodiagnostic testing are evidenced by the fact that the results of the EMG and NCS testing were almost never used to affect or influence patient treatment.

323.   That is, Summit Physicians Group, Summit Medical, Greater Detroit PT, Jankowski, and Lerner ordered and billed for EMG and NCS, but did not use the results to create, adjust, or direct each patient's treatment plan.

324.   Indeed, in several instances, the defendants established a treatment plan (almost always involving physical therapy, discussed *supra*) before electrodiagnostic testing was ordered and before the results of the testing were known.

325.   These treatment plans almost never changed even after the EMG/NCS results came back.

58

326.   If the defendants were capable of establishing treatment plans and their treatment plans never changed based on the electrodiagnostic testing done, the EMG and NCS studies were not medically necessary and had no clinical utility.

F.   MEDICALLY UNNECESSARY PROCEDURES

327.   The defendants subjected their patients to a battery of unnecessary epidural steroid injections, bilateral facet joint injections, and other injection-related services.

328.   In fact, the defendants billed Allstate almost half a million dollars for the battery of epidural steroid injections, bilateral facet joint injections, and other injection-related services purportedly performed on patients at issue in this Complaint.  *See* Exhibits 3, 4, and 6.

329.   An epidural steroid injection ("ESI") delivers steroids directly into the epidural space in the spine.

330.   Typically, a solution containing a steroid with local anesthetic and/or saline is used in such procedures.

331.   A steroid is usually injected as an anti-inflammatory agent.

332.   ESI is often used to treat radicular pain, which is pain that radiates from the site of a pinched nerve in the back to the area of the body aligned with that nerve, such as the back of the leg or into the foot.

333.   ESI may be administered when other nonsurgical treatment has failed to relieve the patient's pain.

334.   However, the defendants resorted to ESI for several patients at issue in this Complaint in the initial stages of treatment as a matter of course.

335.   The defendants rarely allowed conservative treatment to run its course prior to recommending the patient for ESI.

336.   Even in those instances where patients reported improvement from conservative treatment, the defendants nonetheless continued to push for ESI to be administered.

337.   In fact, patients who refused ESI treatment were labeled as "noncompliant" even when the patient stated he/she was getting better and did not see the need for continued ESI treatment.

338.   Allstate is not required to reimburse the defendants for medically unnecessary ESI treatment that was only recommended and performed to bolster claims submitted to Allstate.

339.   Summit Medical and Summit Physicians Group each also billed Allstate for "percutaneous implantation of neurostimulator electrodes," or P-Stim treatment.

340.   P-Stim treatment is a form of acupuncture combined with electrical stimulation where all of the acupuncture points are located behind a patient's ear.

60

341.   The P-Stim device is a miniaturized, battery-powered, transcutaneous electrical nerve stimulator with pre-programed frequency, pulse, and duration.

342.   The P-Stim device connects via three stainless steel wires to acupuncture needles that have been applied to the three points of maximal pain behind a patient's ear.

343.   As an initial matter, P-Stim is not a procedure widely accepted in the medical community, and there is a dearth of literature supporting the use of P-Stim.

344.   Notwithstanding its lack of medical acceptance, the defendants held out P-Stim as a surgical procedure, when it is at most a form of acupuncture.

345.   Jankowski and other licensed healthcare providers working for Summit Physicians Group and Summit Medical purportedly performed all P-Stim treatment in the fluoroscopy suite located within Summit Medical.

346.   Although P-Stim does not require such a sterile environment, Jankowski and other licensed healthcare providers routinely submitted medical records stating "the ear was prepped and draped in a usual sterile fashion" and that the "pins were inserted along the previously marked sites."

347.   However, the more accurate term for the P-Stim procedure would be "applied," and not "inserted" or "implanted," as Jankowski often indicated.

348.   The term "implanted" suggests a surgical procedure beyond the mere application of acupuncture needles, which is all that P-Stim involves.

61

349.  Furthermore, P-Stim has not been shown to be beneficial or more beneficial than traditional forms of treatment modalities.

350.  P-Stim devices have only been approved by the Food and Drug Administration as electro-acupuncture.

351.  Allstate is not required to reimburse the defendants for medically unnecessary procedures such as the application of P-Stim to patients.

**G.  EXEMPLAR CLAIMS**

352.  The following representative patients exemplify the symptom magnification, excessive diagnostic testing, and unnecessary treatment rendered by the defendants.

**1.  Patient L.A.  (Claim No. 150222601)**

353.  Patient L.A. was involved in an alleged motor vehicle accident on March 24, 2015.

354.  L.A. presented to the emergency room of Henry Ford Hospital on March 24, 2015 with complaints of pain "only in neck, shoulder, arm on R side but denies numbness/tingling/weakness."

355.  L.A. testified that he was referred to Summit Physicians Group by a woman named "Nikki":

> Q:  And Nikki actually came to the hospital after the accident?

> A:   I didn't see her, though, I didn't see her yet. I didn't know how she knew to call me. I was wondering how she knew about the accident.
>
> Q:   When did you first hear from Nikki?
>
> A:   The first time I met her I was going home from the hospital. Then she called me and it was the next week on Friday and she came to my home, my mom's house.

356.   Upon information and belief, Nikki's real name is Nakhisha Holloway who solicited L.A. through her involvement with Attentive Care Solution, Inc. and Zahir Shah.

357.   L.A. presented to Summit Physicians Group on April 24, 2015 based on Nikki's referral and met with Lerner.

358.   According to Lerner's medical record from the initial evaluation purportedly conducted on April 24, 2015, L.A.'s "history was taken through an interpreter" by Lerner and L.A. allegedly reported that "he was hit hard and fast."

359.   However, according to L.A.'s own testimony, Lerner refused to provide an interpreter for L.A. (who is deaf and mute):

> Q:   Did you immediately tell Dr. Lerner that you needed an interpreter when you first saw him, when he came into that office room to see you?
>
> A:   I told him interpreter, please.
>
> Q:   Did you tell him several times?
>
> A:   He said I can't afford it.

Q:    Who can't afford it, him or you?

A:    The doctor said he couldn't afford it.

Q:    And you asked for an interpreter several times from
Dr. Lerner during that first visit?

A:    Yes, I asked several times.

360.    Lerner's initial impressions of L.A.'s injuries were: 1) cervical, dorsal, and lumbar myositis with possible cervical and lumbar radiculopathy; 2) right groin tendonitis; 3) post traumatic cervicalgia; 4) right shoulder rotator cuff tendonitis; and 5) right little finger tendonitis.

361.    According to the emergency room records of Henry Ford Hospital on March 24, 2015, L.A. "denie[d] numbness/tingling/weakness."

362.    Lerner also provided L.A. with a disability certificate stating L.A. was disabled from April 24, 2015 through May 22, 2015 relating to employment, housework, and driving.

363.    L.A. testified that Lerner never asked him the necessary information to determine whether L.A. was in fact disabled:

Q:    Okay.   Did [Lerner] ask you about whether you
were working at the time of the accident?

A:    No, um-um, no.

64

364.   L.A. further testified:

> Q:   Did [Lerner] ask you about what daily activities you typically did?
>
> A:   Talked about pills.   He didn't ask much.   Said maybe next week come back or in a month.

365.   Lerner prescribed L.A. durable medical equipment (DME) consisting of a heating pad; TENS unit; lumbosacral corset; and soft cervical collar during the initial evaluation.

366.   However, the DME prescribed by Lerner and billed to Allstate was not dispensed to L.A.:

> Q:   So this doctor who is Dr. Lerner, after your first visit with him did you receive a back brace?
>
> A:   No.
>
> Q:   After your first visit with Dr. Lerner did you receive a neck collar?
>
> A:   No.
>
> Q:   After your first visit with –
>
> A:   I don't have one so –
>
> Q:   Okay.  After your first visit with Dr. Lerner did you receive a heating pad?
>
> A:   No.
>
> Q:   After your first visit with Dr. Lerner did you receive what's called a TENS unit?  It provides electrical stimulus to certain parts of your body?

A:    I know I don't have it, no.

367.   Lastly, Lerner allegedly prescribed physical therapy three (3) times a week for four (4) weeks during the initial office visit.

368.   Allstate was billed by Kinetix Rehab Services, Inc. ("Kinetix") for the medically unnecessary physical therapy received by L.A.

369.   Upon information and belief, L.A. received physical therapy based solely the referral of a non-licensed layperson and not due to medical necessity:

Q:    You were referred to physical therapy, did Dr. Lerner refer you to the therapist?

A:    Let me back up.  Wait a minute.  Refer to therapy, Nikki was the first one to take me and take me to therapy and then after that to the doctor.  There was no referral done.

Q:    Okay.  So as far as you know no doctor referred you to therapy, Nikki just came and took you there; is that right?

A:    Yes.

Q:    Did anyone give you any option of where to get the physical therapy?

A:    No, just the same place was where I went and got therapy.  No one said you have other options, no, nobody did.

Q:    Do you remember talking with Dr. Lerner about where the physical therapy would be?

A:    No.

370. In fact, upon information and belief, "Nikki" chose Kinetix only because Zahir Shah held an ownership interest in Kinetix at the time of L.A.'s physical therapy treatment there.

371. It is clear that Lerner exaggerated L.A.'s injuries for the purpose of submitting inflated bills to Allstate based on the numerous inaccuracies contained in the medical records.

372. Summit Physicians Group and Lerner submitted fabricated medical records to Allstate through the U.S. Mail for the purpose of falsely justifying medical treatment allegedly rendered to L.A.

373. L.A. is used as an exemplar claim to identify the pattern of deception and unnecessary treatment utilized by the defendants.

## 2.    Patient A.M.  (Claim No. 0316474253)

374. Patient A.M. was involved in an alleged motor vehicle accident on February 14, 2014.

375. A.M. presented to the emergency room of the University of Michigan Health System on February 14, 2014 with complaints of right hand pain and left knee pain.

376. According to the February 14, 2014 emergency room medical records, A.M. was "otherwise [a] healthy restrained passenger" and "[d]enie[d] LOC [loss of consciousness]" during the motor vehicle accident.

377.   A.M. was discharged to home/self-care and determined to have an isolated right hand injury.

378.   A.M. presented to Summit Physicians Group on June 3, 2014 and purportedly received an initial evaluation from Lerner.

379.   According to Lerner's medical record from the initial evaluation purportedly conducted on June 3, 2014, A.M.'s motor vehicle was hit "hard and fast" and A.M. "was thrown forward into the dashboard and her left knee hit underneath the dashboard and her face hit the airbag."

380.   Lerner also noted that A.M. "did loose [sic] consciousness for 30 seconds" and that the "impact did fracture the fourth and fifth metacarpals of both hands."

381.   According to Lerner, A.M. complained of "pain in the right hand and wrist, numbness in the fourth and fifth fingers of the right hand, weakness of right hand grip. … [A.M.] has headaches, low back pain radiating to the right lower extremity with numbness to the knee.  She also has pain in the left knee as well."

382.   Lerner's initial impressions of A.M.'s injuries were: 1) fracture of the right hand at the fourth and fifth metacarpal bones; 2) reflex sympathetic dystrophy of the right hand; 3) right hand and wrist tendonitis; 4) posttraumatic cephalgia; 5) lumbar myositis with right sciatica; and 6) internal derangement of the left knee.

383.   Lerner's medical record is in stark contrast to the findings made during A.M.'s visit to the emergency room at the University of Michigan's Hospital.

384.   Lerner prescribed A.M. the following medications: Norco; Flexeril; Mobic; Neurontin; Prilosec; and Ultram during the initial evaluation.

385.   Lerner also prescribed A.M. DME consisting of a lumbar brace; heating pad; TENS unit with supplies; and a left knee brace during the initial evaluation.

386.   It is clear that the Lerner's findings are contradictory to the findings made during A.M.'s visit to the emergency room on the same date as the motor vehicle accident.

387.   Lerner also purportedly performed electrodiagnostic testing on A.M. during her June 3, 2014 office visit although there is no recommendation for such testing documented in A.M.'s initial evaluation record.

388.   According to Lerner's report, there was no evidence of cervical or lumbosacral radiculopathy.

389.   According to the procedure note dated June 11, 2014, Lerner ordered A.M. to have a P-Stim device attached based on "generalized pain."

390.   Summit Physicians Group and Lerner submitted fabricated medical records to Allstate through the U.S. Mail for the purpose of falsely justifying medical treatment rendered to A.M.

391.   Allstate relied upon the medical record and bills submitted by Summit Physicians Group and Lerner when adjusting the claims.

### 3.   Patient D.B.  (Claim No. TXA0131453)

392.   Patient D.B. was involved in an alleged motor vehicle accident on April 29, 2014.

393.   D.B. presented to the emergency room of Oakwood Hospital and Medical Center on April 29, 2014 with a complaint of "left sided neck pain" resulting from a "low speed" motor vehicle accident.

394.   According to the April 29, 2014 emergency room medical records, D.B. stated she had "mild" neck pain and "no chest pain, no numbness, no visual change, no abdominal pain, patient does not experience disorientation, no loss of consciousness, no tingling and no shortness of breath."

395.   D.B. presented to Summit Physicians Group on August 22, 2014 and purportedly received an initial evaluation from Lerner.

396.   Lerner reported that D.B. presented with complaints of "neck pain radiating to both upper extremities to the hands and numbness and paresthesias. [D.B.] has mid back pain and low back pain with radiating to the left lower extremity to the knee and thigh with numbness and severe headaches that keep her from sleeping" and she "gets some intermittent dizziness when she bends over."

397.   According to Lerner's medical record from the initial evaluation purportedly conducted on August 22, 2014, D.B.'s motor vehicle was "travelling approximately 40 mph," "hit hard and fast," and D.B. was "very jarred."

398.   Lerner reported that D.B. "was thrown forward and backward, side-to-side and all around during the motor vehicle accident."

399.   Lerner further reported that D.B. "hit her head on the steering wheel" and "had loss of consciousness for a second[.]"

400.   Lerner's initial impressions of D.B.'s injuries were: 1) cervical, dorsal, and lumbar myositis with left sciatica; and 2) posttraumatic cephalgia with intermittent vertigo.

401.   Lerner also reported that D.B. had a purported "[h]ousekeeping disability" during the initial evaluation.

402.   Lerner prescribed D.B. the following medications: Antivert; Vimovo; Amrix; Gralise; and Cambia during the initial evaluation.

403.   Lerner also prescribed DME consisting of a lumbar brace; heating pad; and TENS unit with supplies during the initial evaluation.

404.   It is clear that Lerner's findings are contradictory to the findings made during D.B.'s visit to the emergency room on the same date as the motor vehicle accident.

405.   Lerner also performed electrodiagnostic testing on D.B. during the August 22, 2014 office visit.

406.   According to Lerner's report, there was no evidence of cervical or lumbosacral radiculopathy.

407.   Summit Physicians Group and Lerner submitted fabricated medical records to Allstate through the U.S. Mail for the purpose of falsely justifying medical treatment rendered to D.B.

408.   Allstate relied upon the medical record and bills submitted by Summit Physicians Group and Lerner when adjusting the claim.

### 4.   Patient S.I.  (Claim No. 0257938415)

409.   Patient S.I. was involved in an alleged motor vehicle accident on September 2, 2012.

410.   S.I. presented to the emergency room of Oakland Hospital on September 2, 2012 with complaints of left hand pain and neck pain resulting from a "minor MVC [motor vehicle collision]."

411.   According to the September 2, 2012 emergency room medical records, S.I. had no loss of consciousness and presented with only a left hand abrasion.

412.   S.I. presented to Greater Detroit PT on March 28, 2013 and purportedly received an initial evaluation from Lerner.

413.   Lerner reported that S.I. presented with complaints of "headaches on the right side of her head with intermittent dizziness, neck pain radiating to both shoulders, mid back pain and low back pain radiating to bilateral lower extremities, pain in the right and left knees" and that the patient is "forgetful" and has "problems with her memory, thinking, and concentration."

414.   According to Lerner's medical record from the initial evaluation purportedly conducted on March 28, 2013, S.I.'s motor vehicle was "hit hard and fast" and subsequently "totalled [sic]."

415.   Lerner reported that S.I. "hit her head on the side window" and was "very jarred."

416.   Lerner further reported that S.I. "was thrown up and down and side-to-side" and "hit her head on the ceiling of the car."

417.   Lerner's initial impressions of S.I.'s injuries included but were not limited to: 1) headaches with probable closed head injury; 2) cervical, dorsal, and lumbar myositis with right and left sciatica; 3) vertigo; and 4) internal derangement of the right and left knee.

418.   Lerner referred S.I. for physical therapy and notated she had a purported housekeeping disability.

419.   Lerner prescribed S.I. the following medications: Naprelan; Dexilant; Rybix; Amrix; Libroderm patch; and Gralise during the initial evaluation.

420.   Lerner also prescribed DME consisting of a collar, back brace, heating pad, left thumb and wrist splint, and TENS unit during the initial evaluation.

421.   It is clear that Lerner's findings are contradictory to the findings made during S.I.'s visit to the emergency room on the same date as the motor vehicle accident.

422.   Specifically, S.I. never mentioned any injury to her head, that she hit her knee, or that she was "thrown around" the car while at Oakland Hospital on the same date as the motor vehicle accident.

423.   Furthermore, while S.I. was at Oakland Hospital, her neurological exam was unremarkable, and the CT scans of her neck and cervical spine were negative.

424.   Lerner performed electrodiagnostic testing on S.I. during her April 25, 2013 office visit to Greater Detroit PT.

425.   According to Lerner's report, there was no evidence of lumbosacral radiculopathy or neuropathy.

426.   There was no justification for Lerner's impressions of S.I.'s injuries purportedly sustained during the September 2, 2012 motor vehicle accident or the subsequent medical treatment purportedly rendered.

427. Greater Detroit PT and Lerner submitted fabricated medical records to Allstate through the U.S. Mail for the purpose of falsely justifying medical treatment rendered to S.I.

428. Allstate relied upon the medical record and bills submitted by Greater Detroit PT and Lerner when adjusting the claim.

## 5.   Patient M.B.  (Claim No. 0256651076)

429. Patient M.B. was involved in an alleged motor vehicle accident on August 10, 2012.

430. M.B. presented to Summit Medical on April 9, 2013 and purportedly received an initial evaluation from Jankowski.

431. Jankowski's medical record from April 9, 2013 indicates that M.B. "refused any epidural injection therapy" and that Jankowski "recommended [M.B.] to undergo surgery into his neck and low back, which he has refused as well."

432. Jankowski's initial evaluation of M.B. also includes an assessment of "noncompliance with treatment plan."

433. Jankowski diagnosed M.B., who at the time of the initial examination was seventy (70) years old, with ten (10) pain conditions and recommended an extensive and aggressive eleven (11) step treatment plan during this initial consultation.

434. M.B. received a physical therapy prescription from Jankowski and a disability certification during the initial evaluation.

435. Jankowski failed to include any mention of radiculopathy or indicate findings of focal neurological deficit during the initial evaluation.

436. Despite the lack of objective neurological findings or radiculopathy, Jankowski nonetheless scheduled M.B. for an upper and lower EMG study that was performed on the same date as the initial consultation at Summit Medical.

437. The EMG testing studied ten (10) muscles, which, as explained above, is excessive and would have involved the insertion of ten (10) needles into M.B.'s muscles during this single visit.

438. Although requested numerous times, Allstate was not provided with Jankowski's report for the April 9, 2013 electrodiagnostic testing.

439. Jankowski scheduled M.B. for a second upper and lower EMG study that was performed on May 14, 2013.

440. According to Lerner's medical report of May 14, 2014, the upper and lower EMG study revealed no evidence of radiculopathy.

441. As an initial matter, without an objective finding of a neurologic deficit in the first place, the EMG studies were not supported and thus medically unnecessary as not indicated by M.B.'s clinical exam, or lack thereof.

442.   Second, the actual conduction of the EMG study was improper and excessively tested ten (10) muscles.

443.   Finally, the findings of the unwarranted EMG studies were normal, confirming that there was no justification for ordering them in the first place.

444.   Summit Medical submitted claims for payment and medical records relative to the EMG studies provided to M.B. to Allstate through the U.S. Mail.

445.   Allstate relied upon these submissions in adjusting the claims for payment.

### 6.   Patient A.G.  (Claim No. 0291451375)

446.   Patient A.G. was involved in an alleged motor vehicle accident on June 29, 2013.

447.   A.G. presented to Summit Physicians Group on June 25, 2014 and purportedly received an initial evaluation from Jankowski.

448.   Jankowski diagnosed A.G. with nine (9) pain conditions and recommended an extensive and aggressive six (6) step treatment plan during this initial consultation.

449.   Jankowski issued a disability certificate and prescribed the following medications: Naprosyn; Robaxin; and Norco during the initial evaluation with A.G.

450.   Jankowski failed to include any mention of radiculopathy or indicate findings of focal neurological deficit during the initial evaluation.

451.   Despite the lack of objective neurological findings or radiculopathy, Jankowski nonetheless scheduled A.G. for an upper and lower EMG study that was performed by Lerner on September 23, 2014.

452.   According to Lerner's medical report dated November 4, 2014, the September 23, 2014 EMG study revealed no evidence of lumbosacral radiculopathy or peripheral neuropathy.

453.   As an initial matter, without an objective finding of a neurologic deficit in the first place, the EMG studies were not supported and thus medically unnecessary as not indicated by A.G.'s clinical exam, or lack thereof.

454.   Second, the actual conduction of the EMG study was improper and excessively tested eight (8) muscles.

455.   Finally, the findings of the unwarranted EMG studies were normal, confirming that there was no justification for ordering them in the first place.

456.   Lerner's report indicates that the EMG study was performed at 1678 Merriman Road, but the bill submitted to Allstate claims the EMG study was performed at 8560 Silvery Lane.

457.   Lerner engaged in this identical falsifying of records scheme when he admitted to defrauding Medicare (i.e., Lerner saw patients at one location but submitted bills claiming he saw the same patient at a different location for that date of service).

78

458.   Summit Physicians Group and Lerner submitted claims for payment and medical records relative to the EMG studies provided to A.G. to Allstate through the U.S. Mail.

459.   Allstate relied upon these submissions in adjusting the claims for payment.

### 7.   Patient M.M.  (Claim No. TXA0126823)

460.   Patient M.M. was involved in an alleged motor vehicle accident on January 27, 2014.

461.   M.M. presented to Summit Physicians Group on January 27, 2014 and purportedly received an initial evaluation from Lerner.

462.   Lerner did not report a finding of radiculopathy during the initial evaluation.

463.   Furthermore, the initial evaluation failed to indicate findings of focal neurological deficit by Lerner.

464.   In fact, Lerner reported that M.M. had normal muscle strength and normal reflexes the following visit (January 28, 2014).

465.   Despite the lack of objective neurological findings or radiculopathy, Lerner nonetheless scheduled M.M. for an upper and lower EMG study that was performed by Lerner on February 26, 2014.

466.   Not surprising, M.M.'s EMG studies were determined to be normal and indicated no evidence of cervical or lumbosacral radiculopathy.

467.   As an initial matter, without an objective finding of a neurologic deficit in the first place, the EMG studies were not supported and thus medically unnecessary as not indicated by M.M.'s clinical exam, or lack thereof.

468.   Second, the actual conduction of the EMG study was improper and excessively tested twenty (20) muscles.

469.   Finally, the findings of the unwarranted EMG studies were normal, confirming that there was no justification for ordering them in the first place.

470.   Summit Physicians Group and Lerner submitted claims for payment and medical records relative to the EMG studies provided to M.M. to Allstate through the U.S. Mail.

471.   Allstate relied upon these submissions in adjusting the claims for payment.

### 8.   Patient E.F.  (Claim No. 0214242109)

472.   Patient E.F. was involved in an alleged motor vehicle accident on August 17, 2011.

473.   E.F. presented to Summit Medical on April 10, 2013 and purportedly received an initial evaluation from Jankowski.

474.   Jankowski did not report a finding of radiculopathy during the initial evaluation.

475.   Furthermore, the initial evaluation failed to indicate findings of focal neurological deficit by Jankowski.

476.   Despite the lack of objective neurological findings or radiculopathy, Jankowski nonetheless scheduled E.F. for an upper and lower EMG study that was performed by Lerner on April 16, 2013.

477.   Not surprising, E.F.'s EMG studies were determined to be normal and indicated no evidence of cervical or lumbosacral radiculopathy.

478.   As an initial matter, without an objective finding of a neurologic deficit in the first place, the EMG studies were not supported and thus medically unnecessary as not indicated by E.F.'s clinical exam, or lack thereof.

479.   Second, the actual conduction of the EMG study was improper and excessively tested nineteen (19) muscles.

480.   Finally, the findings of the unwarranted EMG studies were normal, confirming that there was no justification for ordering them in the first place.

481.   Summit Medical and Jankowski submitted claims for payment and medical records relative to the EMG studies provided to E.F. to Allstate through the U.S. Mail.

482.   Allstate relied upon these submissions in adjusting the claims for payment.

**9.     Patient T.K.  (Claim No. 0274048891)**

483.   Patient T.K. was involved in an alleged motor vehicle accident on January 22, 2013.

484.   T.K. presented to Greater Detroit PT on February 28, 2013 and purportedly received an initial evaluation from Lerner.

485.   The initial evaluation purportedly performed by Lerner failed to indicate findings of focal neurological deficits.

486.   Lerner's documentation is devoid of any rigorous neurological examinations or delineation of clinical thought processes.

487.   Lerner's initial evaluation of T.K. contains minimal muscle strength testing and no sensory or reflex testing was performed.

488.   Despite the lack of objective neurological findings or physical exam findings, Lerner nonetheless scheduled T.K. for an upper extremity EMG study that was performed on the same date as the initial consultation at Greater Detroit PT.

489.   The EMG testing studied eleven (11) muscles, which, as explained above, is excessive and would have involved the insertion of eleven (11) needles into T.K.'s muscles during this single visit.

490.   The results of the EMG were normal, confirming that there was no justification for ordering them in the first place.

491.   Lerner scheduled T.K. for a lower extremity EMG study that was performed on March 7, 2013.

492.   The medical records fail to show the results of the EMG purportedly performed on March 7, 2013.

493.   In fact, Lerner never mentions the EMG results in any of the medical records dated after March 7, 2013.

494.   As an initial matter, without an objective finding of a neurologic deficit in the first place, the EMG studies were not supported and thus medically unnecessary as not indicated by T.K.'s clinical exam, or lack thereof.

495.   Second, the actual conduction of the EMG study was improper and excessively tested eleven (11) muscles.

496.   Finally, the findings of the unwarranted EMG studies were normal.

497.   Greater Detroit PT and Lerner submitted claims for payment and medical records relative to the EMG studies provided to T.K. to Allstate through the U.S. Mail.

498.   Allstate relied upon these submissions in adjusting the claims for payment.

## 10.    Patient M.D.  (Claim No. 0266797785)

499.    Patient M.D. was involved in an alleged motor vehicle accident that occurred on August 11, 2012.

500.    M.D. presented to Summit Medical on February 7, 2013 for an initial evaluation that was purportedly conducted by Jankowski.

501.    Jankowski noted that "MRIs were done last week" but the "results were not available" during the initial evaluation.

502.    Even though Jankowski did not review the MRIs that were done shortly before the initial evaluation, he scheduled M.D. for an EMG study and recommended injection therapy.

503.    Jankowski scheduled M.D. for a lumbar steroid injection during M.D.'s follow up visit on March 7, 2013.

504.    On April 11, 2013, M.D. underwent a lumbar ESI procedure at Summit Medical.

505.    During her next visit to Summit Medical on May 6, 2013, M.D. advised Jankowski that the ESI "did not help at all and in fact made things worse."

506.    However, during her visit on June 4, 2013, Jankowski reported that M.D. "had one lumbar epidural steroid injection, which did afford her 70% to 80% benefit in alleviating her back pain that lasted for two to three days" and further reported that M.D. was "pleased with and has refused any further injections."

507. Notwithstanding M.D.'s refusal to have any further injections performed, Jankowski recommended further injection treatment during the June 4, 2013 office visit.

508. Jankowski's own documentation indicates a persistent effort to pursue ESI despite the patient's refusal as well as prior statements from the patient that the ESI made her worse.

509. Summit Medical and Jankowski submitted claims for payment and accompanying medical records relative to M.D. to Allstate through the U.S. Mail seeking reimbursement for the medically unnecessary treatment rendered.

510. Allstate relied upon Summit Medical's and Jankowski's submissions in adjusting the claims.

### 11.   Patient S.E.  (Claim No. 0308107168)

511. Patient S.E. was involved in an alleged motor vehicle accident that occurred on December 3, 2013.

512. S.E. presented to Summit Physicians Group on December 12, 2013 for an initial evaluation that was purportedly conducted by Jankowski.

513. Jankowski noted decreased range of motion in S.E.'s right shoulder and further noted that S.A.'s left shoulder examination was benign.

514. Jankowski scheduled S.E. for a "bilateral shoulder and cervical spine MRI for further evaluation and assistance."

515.   During S.E.'s next visit to Summit Physicians Group on January 10, 2014, Jankowski failed to indicate in the medical record that he reviewed the MRI report relating to S.E.'s right shoulder MRI performed on December 17, 2013.

516.   Jankowski scheduled S.E. for an ESI of her right shoulder without discussing the MRI report with S.E.

517.   On January 10, 2014, S.E. underwent a right shoulder injection at Summit Physicians Group performed by Jankowski.

518.   During S.E.'s follow up visit to Summit Physicians Group on February 7, 2014, Jankowski failed to notate whether S.E. benefited from the injection therapy.

519.   Jankowski again failed to mention any benefit to the injection therapy performed on January 10, 2014 during S.E.'s March 14, 2014 follow up visit, although Jankowski recommended that S.E. follow up with Crawford regarding her shoulder pain.

520.   During S.E.'s April 16, 2014 office visit to Summit Physicians Group, S.E. received a second injection in her right shoulder, ESI in her cervical and lumbar spine, an SI joint injection, and occipital nerve block treatment, all performed by Jankowski.

521.   During S.E.'s May 15, 2014 follow up at Summit Physicians Group, Jankowski indicated S.E.'s "noncompliance to treatment plan as the patient has

refused to go to physical therapy and refused shoulder injections and has refused to see Dr. Crawford from orthopedic surgery[.]"

522.   Notwithstanding S.E.'s refusal to have any further shoulder injections performed or to see Crawford for surgery, Jankowski scheduled S.E. for further injection treatment and scheduled a consult with Crawford regarding her left shoulder pain.

523.   Importantly, S.E.'s left shoulder was consistently found to be benign.

524.   Jankowski's own documentation indicates a persistent effort to pursue injection treatment despite the patient's refusal to continue with injection treatment.

525.   Summit Physicians Group and Jankowski submitted claims for payment and accompanying medical records relative to S.E. to Allstate through the U.S. Mail seeking reimbursement for the medically unnecessary treatment rendered.

526.   Allstate relied upon Summit Physicians Group's and Jankowski's submissions in adjusting the claims.

## VII.   UNLAWFUL AND UNNECESSARY MRI SCANS

### A.   SUMMIT PHYSICIANS GROUP UNLAWFULLY PERFORMED MRI SCANS

527.   Michigan's Certificate of Need ("CON") program is a state regulatory program intended to balance cost, quality, and access issues, and ensure that only needed services and facilities are developed in Michigan.

528.   A Michigan MRI facility proposing to acquire an existing facility, operate a new facility, or initiate, replace, or expand covered clinical services must obtain a CON.  *See* Mich. Comp. Laws § 333.22209(1) (applicable to MRI facilities through Mich. Comp. Laws §§ 333.22207(4) and 333.1106(2)).

529.   "Except as otherwise provided in this part, a person shall not do any of the following without first obtaining a certificate of need: (a) [a]cquire an existing health facility or begin operation of a health facility at a site that is not currently licensed for that type of health facility[;] (b) [m]ake a change in the bed capacity of a health facility[;] (c) **[i]nitiate, replace, or expand a covered clinical service**[; and] (d) [m]ake a covered capital expenditure."   Mich. Comp. Laws § 333.22209(1)(a-d) (emphasis added).

530.   Fixed and mobile MRI services are "covered clinical services" under Michigan law.  *See* Mich. Comp. Laws § 333.22203(10)(b)(vi).

531.   Pursuant to Michigan's Administrative Procedures Act of 1969, a "[l]icense" includes the whole or part of an agency permit, **certificate**, approval, registration, charter, or similar form of permission required by law, but does not include a license required solely for revenue purposes, or a license or registration issued under the Michigan vehicle code, 1949 PA 300, MCL 257.1 to 257.923." Mich. Comp. Laws § 24.205 (emphasis added).

532.   Therefore, MRI facilities in Michigan are required to obtain approval of a CON application to "initiate, replace, or expand" prior to providing MRI services to patients.  *See* Mich. Comp. Laws § 333.22209(1)(c).

533.   On June 4, 2013, David W. Williams, Summit Physicians Group's authorized representative, submitted documents to the Michigan Department of Community Health in support of Summit Physicians Group's CON application seeking to "acquire the existing MRI host site CON and service from existing MRI Network 85."  *See* Exhibit 14.

534.   Summit Physicians Group's CON application was approved on August 28, 2013.

535.   However, Summit Physicians Group improperly billed Allstate seeking payment for MRI scans that were performed prior to August 28, 2013.

536.   Summit Physicians Group billed Allstate for thirteen (13) MRIs prior to its CON application approval totaling in excess of $42,360.  *See* Exhibit 15.

537.   According to Mich. Comp. Laws § 333.22247(3), "[a] person shall not charge to, or collect from, another person or otherwise recover costs for services provided or for equipment or facilities that are acquired in violation of this part.  If a person has violated this subsection, in addition to the sanctions provided under subsection (2), the person shall, upon request of the person from whom the charges

were collected, refund those charges, either directly or through a credit on a subsequent bill."

538.    Allstate is not required to compensate Summit Physicians Group for the performance of MRI scans without a license.

539.    Furthermore, Allstate is entitled to the return of monies paid to Summit Physicians Group for the unlawful MRI scans performed without a license.

## B.    MEDICALLY UNNECESSARY AND CLINICALLY USELESS MRI SCANS

540.    The Michigan No-Fault Act only requires Allstate to pay for "reasonably necessary products, services, and accommodations for an injured person's care, recovery, or rehabilitation" arising out of a motor vehicle accident. Mich. Comp. Laws § 500.3107(1)(a).

541.    As discussed *supra*, the defendants engaged in a scheme to increase the profitability of each patient purportedly treated by providing medically unnecessary ancillary services such as MRI scans to the patients at issue in this Complaint.

542.    The MRI referrals made by the defendants were unnecessary and fraudulent because the referrals were made in furtherance of the scheme to bill Allstate for as many ancillary services as possible, in furtherance of their *quid pro quo* relationships, and not based on the individual needs of the patient.

90

543.    Jankowski stated in his email dated April 19, 2011 (discussed *supra*) that "the ability to bill for the [MRI] machine is the ultimate goal for all involved, although some ownership if possible is desired." *See* Exhibit 1.

544.    Jankowski later testified that Summit did in fact own an MRI machine:

Q:      And who owns the [MRI] machine?

A:      We own the [MRI] machine.

545.    Jankowski also noted in his email that involving Summit in this scheme to generate bills for MRIs "to capture the Auto rates is necessary for all involved." Id.

546.    To demonstrate the profitability of MRI billings, Jankowski circulated a document on Summit Medical's letterhead setting out the number of MRI referrals that the defendants (Summit Medical, Lerner, Crawford) would generate monthly and specifically stated that these amounts were "without a commitment from 1800-pain or US lawyers of which should be 300 [per] month[.]" *See* Exhibit 9.

547.    According to Jankowski's memo, Summit Medical, for example, would "average 10 per day about 5 times a week = 50 per week or 200 per month"; Lerner would "average about 8 auto per day – 160 per month" and "average about 8 conventional per day = 160 per month" totaling "320 per month"; and Crawford would "average 30 per week = 120 per month." Id.

548.   MRI providers in Michigan are required to provide the State of Michigan with data that reflects information about each MRI visit at any MRI facility in Michigan.

549.   According to Summit Diagnostic's admissions to the State of Michigan, defendants Jankowski, Lerner, Crawford, and Giancarlo were responsible for referring more than 90% of the MRIs Summit Diagnostic performed in 2013; more than 74% of the MRIs Summit Diagnostic performed in 2014; and more than 75% of the MRIs Summit Diagnostic performed in 2015.  *See* Exhibits 16, 17, and 18.

550.   According to Summit Physicians Group's admissions to the State of Michigan, defendants Jankowski, Lerner, Crawford, and Giancarlo were responsible for referring more than 99% of the MRIs Summit Physicians Group performed in 2013; more than 92% of the MRIs Summit Physicians Group performed in 2014; and more than 93% of the MRIs Summit Physicians Group performed in 2015.  *See* Exhibits 19, 20, and 21.

551.   MRI referrals based on a pecuniary interest and not based on the patients' actual clinical needs are not compensable under Michigan's No-Fault Act.

552.   The defendants often fail to document why an MRI was recommended or necessary.

553.   This is not surprising as their MRI referrals were based on economic self-interests and not medical necessity.

554.   The defendants also often ordered MRI scans at the onset of the patient's treatment, thus evidencing that MRI was resorted to as a matter of course.

555.   Such a practice is belied by medical literature proving "that unnecessary imaging may do more harm than good.  Multiple randomized controlled trials have shown that the early use of imaging for [lower back pain] is not associated with improved outcomes and may even be harmful to the patient."  Brendan J. McCullough, et al., Lumbar MR Imaging and Reporting Epidemiology: Do Epidemiologic Data in Reports Affect Clinical Management?, 262 Radiology 941, 942 (2012).

556.   Indeed, early resort to MRI has been denounced by The American College of Physicians for its "inefficiencies" and "potential harms."  Id. at 945.

557.   At the onset of a soft tissue injury (the type of injury claimed by almost all of the patients at issue herein), an MRI should only be ordered if there are objective neurological symptoms of spinal cord or other neurological injuries, including radiculopathy (severe back pain radiating into an extremity) or where the medical practitioner suspects the patient has suffered a fracture.

558.   Short of these circumstances, an MRI should be deferred to allow for conservative treatment to run its course.

559.   Other MRIs referred by the defendants and performed by Summit Diagnostic or Summit Physicians Group were unnecessary and unjustified because

93

they were done despite the fact that the patient had shown continuous improvement with conservative treatment.

560.  In the absence of a documented clinical reason why an MRI is nonetheless recommended, it is not medically necessary to refer a patient for an MRI where the established treatment plan is working.

1.  **Exemplar Claims**

a.  **Patient C.K.  (Claim No. TXA0122243)**

561.  Patient C.K. was purportedly involved in a motor vehicle accident that occurred on October 23, 2013.

562.  C.K. presented to Summit Physicians Group on October 25, 2013 and purportedly received an initial evaluation from Jankowski.

563.  During the October 25, 2013 office visit, Jankowski diagnosed C.K. with six (6) pain conditions and instituted an extensive and aggressive seven (7) step treatment plan.

564.  C.K. returned to Summit Physicians Group for a follow up appointment on November 22, 2013.

565.  During her follow up appointment at Summit Physicians Group, Jankowski scheduled C.K. for MRI scans of her left shoulder and the lumbar and cervical regions of the spine.

566.   Summit Physicians Group billed Allstate for the MRI scans of C.K.'s left shoulder, lumbar spine, and cervical spine performed on November 26, 2013.

567.   The American College of Occupational and Environmental Medicine supports the use of an MRI when there are neurological deficits that have failed to respond to conservative treatments.

568.   C.K.'s medical record of November 22, 2013 lacked any evidence of focal neurological deficits or physical examination findings that would justify the medical necessity of the MRI scans.

569.   Thus, Jankowski's MRI referrals relative to C.K. were not justified.

570.   Summit Physicians Group and Jankowski submitted claims for payment and accompanying medical records relative to C.K. to Allstate through the U.S. Mail seeking reimbursement for the medically unnecessary MRIs.

571.   Allstate relied upon Summit Physicians Group's and Jankowski's submissions in adjusting the claims.

### b.   Patient A.A.  (Claim No. TXA0138401)

572.   Patient A.A. was involved in an alleged motor vehicle accident that occurred on August 15, 2014.

573.   A.A. presented to Summit Physicians Group on September 3, 2014 and purportedly received an initial evaluation from Lerner.

574.    A.A. returned to Summit Physicians Group for a follow up appointment on October 20, 2014.

575.    During the follow up appointment at Summit Physicians Group, Lerner scheduled A.A. for MRI scans of his cervical, thoracic, and lumbar spine to rule out a herniated disc.

576.    Summit Physicians Group billed Allstate for the MRI scans of A.A.'s cervical and thoracic spine performed on October 27, 2014 and A.A.'s lumbar spine performed on October 29, 2014.

577.    The American College of Occupational and Environmental Medicine supports the use of an MRI when there are neurological deficits that have failed to respond to conservative treatments.

578.    There is no indication in A.A.'s medical record of October 20, 2014 that the MRI referrals were medically necessary as Lerner fails to document any focal neurological deficit or a single concerning physical exam finding.

579.    Thus, Lerner's MRI referrals relative to A.A. were not justified.

580.    Summit Physicians Group and Lerner submitted claims for payment and accompanying medical records relative to A.A. to Allstate through the U.S. Mail seeking reimbursement for the medically unnecessary MRIs.

581.    Allstate relied upon Summit Physicians Group's and Lerner's submissions in adjusting the claims.

### c.    Patient L.S.  (Claim No. 0314041336)

582.   Patient L.S. was involved in an alleged motor vehicle accident that occurred on January 26, 2014.

583.   L.S. presented to Summit Physicians Group on February 3, 2014 and purportedly received an initial evaluation from Lerner.

584.   Lerner referred L.S. for MRI scans of her cervical and lumbar spine, right shoulder, and right elbow that were all billed to Allstate by Summit Physicians Group on March 3, 2014.

585.   The American College of Occupational and Environmental Medicine supports the use of an MRI when there are neurological deficits that have failed to respond to conservative treatments.

586.   There is no indication in L.S.'s medical records that the MRI scans were medically necessary as Lerner fails to document any focal neurological deficit or a single concerning physical exam finding.

587.   In fact, L.S.'s right wrist MRI scan reported to be normal and her right shoulder MRI scan indicates she may have mild tendonitis.

588.   L.S.'s cervical and lumbar MRI scans were reported to show disc bulges.

589.   The American College of Occupational and Environmental Medicine specifically warns that "indiscriminate imaging will result in false positive findings,

97

such as disk bulges, that are not the source of the painful symptoms …." The American College of Occupational and Environmental Medicine Occupational Medicine Practice Guidelines, Second Edition, Chapter 12, pg. 303.

590.   In other words, the MRI scans indicated no injury to L.S. resulting from a motor vehicle accident.

591.   Thus, Lerner's MRI referrals relative to L.S. were not justified.

592.   Summit Physicians Group and Lerner submitted claims for payment and accompanying medical records relative to L.S. to Allstate through the U.S. Mail seeking reimbursement for the medically unnecessary MRIs.

593.   Allstate relied upon Summit Physicians Group's and Lerner's submissions in adjusting the claims.

## VIII.  EXCESSIVE AND UNREASONABLE CHARGES

### A.    MICHIGAN LAW REGARDING REASONABLE AND CUSTOMARY CHARGES

594.   As discussed *supra*, the defendants billed for services that were often unnecessary and were performed only to financially benefit the defendants and not to aid in the treatment of patients.

595.   In addition to being unnecessary and unwarranted, Summit Diagnostic and Summit Physicians Group also charged such unreasonable and excessive amounts per MRI as to be fraudulent within the meaning of Mich. Comp. Laws § 500.3148(2).

596.   Summit Physicians Group, Summit Medical, and Greater Detroit PT charged unreasonable and excessive amounts for the medications prescribed and dispensed as to be fraudulent within the meaning of Mich. Comp. Laws § 500.3148(2).

597.   Michigan courts have stated explicitly that "medical care providers are prohibited from charging more than a reasonable fee." McGill v. Auto. Ass'n, 207 Mich. App. 402, 405 (1994).

598.   "Under [Michigan's No-Fault] statutory scheme, an insurer is not liable for any medical expense to the extent it is not a reasonable charge for the particular product or service, or if the product or service itself is not reasonably necessary." Nasser, 435 Mich. at 49 (1990).

599.   "In order for a no-fault insurer to be responsible for a particular expense, three requirements must be satisfied: (1) the expense must have been incurred by the insured, (2) the expense must have been for a product, service, or accommodation reasonably necessary for the injured person's care, recovery, or rehabilitation, and (3) the amount of the expense must have been reasonable." Hamilton v. AAA Mich., 248 Mich. App. 535, 543 (2001) (emphasis added).

600.   The Michigan No-Fault Act is clear that only "reasonable charges" constitute allowable expenses thereunder.  Mich. Comp. Laws § 500.3107(1)(a).

601.   The Michigan No-Fault Act is also clear that a medical provider "lawfully rendering treatment to an injured person for an accidental bodily injury covered by personal protection insurance . . . may charge a <u>reasonable amount</u> for the products, services and accommodations rendered."   Mich. Comp. Laws § 500.3157 (emphasis added).

602.   Michigan Compiled Laws § 500.3157 further provides that "[t]he charge shall not exceed the amount the person or institution customarily charges for like products, services and accommodations in cases not involving insurance."

603.   "[T]he 'customary charge' limitation in § 3157 and the 'reasonableness' language in § 3107 constitute separate and distinct limitations on the amount health-care providers may charge and what insurers must pay with respect to victims of automobile accidents who are covered by no-fault insurance." <u>AOPP v. Auto Club Ins. Ass'n</u>, 257 Mich. App. 365, 376 (2003).

604.   The "customary fee" of a medical provider under Mich. Comp. Laws § 500.3157 does not establish a "reasonable charge" under Mich. Comp. Laws § 500.3107.  <u>Id</u>. at 381.

605.   The "customary fee" under Mich. Comp. Laws § 500.3157 is "simply the cap on what health-care providers can charge, and is not, automatically, a 'reasonable' charge requiring full reimbursement under § 3107."  <u>Id</u>. at 377.

100

606.   Insurers' ability "to assess the reasonableness of charges is not limited to a comparison of customary charges among similar providers." <u>Bronson Methodist Hospital v. Auto-Owners Ins. Co.</u>, 295 Mich. App. 431, 450 (2012).

607.   With respect to at least some medical providers' charges submitted under the Michigan No-Fault Act, insurers may assert that the providers' "markup over the average wholesale cost of those products renders the charges excessive." <u>Id</u>.

608.   Insurers are allowed to consider the cost <u>to the provider</u> "of providing that treatment and not merely the cost of treatment as billed by the provider to the injured person when evaluating the reasonableness of the charges submitted for payment." <u>Id</u>.

609.   A provider who seeks to hold an insurer liable for personal protection insurance benefits under the Michigan No-Fault Act has the burden of proving that the service claimed is reasonably necessary, the charge for the service is reasonable, and the expense is incurred.  <u>Nasser</u>, 435 Mich. at 49.

610.   Indeed, "[t]he reasonableness of the charge is an explicit and necessary element of a claimant's recovery against an insurer, and, accordingly, the burden of proof on this issue lies with the [provider]." <u>AOPP</u>, 257 Mich. App. at 374.

611.   A provider "bears the burden of proving <u>both</u> the reasonableness <u>and</u> the customariness of its charges . . . ." <u>Munson Medical Ctr. v. Auto Club Ins. Ass'n</u>,

101

218 Mich. App. 375, 385 (1996) (emphasis added); *see also* AOPP, 257 Mich. App. at 376.

612.   Insurers are not required "to accept health care providers' unilateral decisions regarding what constitutes reasonable medical expenses, [as this would] effectively eliminat[e] insurance companies' cost-policing function contemplated by the no-fault act." McGill, 207 Mich. App. at 408.

613.   In fact, "[i]nsurers are required to challenge the reasonableness of charges, and providers should expect no less." Bronson, 295 Mich. App. at 448 (internal citations omitted).

614.   "[I]f [an] insurance company paid the bills regardless of their reasonability, that action would, in fact, be in violation of the insurance contract." LaMothe v. Auto Club Ins. Ass'n, 214 Mich. App. 577, 581-582 (1995).

615.   Providers must "furnish forthwith a written report of the . . . costs of treatment of the injured person" if requested by the insurer.  Mich. Comp. Laws § 500.3158(2).

### B.   SUMMIT PHYSICIANS GROUP AND SUMMIT DIAGNOSTIC SUBMIT EXCESSIVE AND UNREASONABLE MRI CHARGES TO ALLSTATE

616.   Michigan law is clear that the burden of proving the reasonableness of charges submitted for No-Fault benefits lies with the provider and that insurers have an obligation to police and challenge unreasonable charges.

617.  For the reasons discussed *infra*, Summit Diagnostic and Summit Physicians Group cannot meet their burden, thereby vitiating Allstate's obligation to pay any of the unreasonable charges for MRIs performed from 2013 through 2016 to date and entitling Allstate to reimbursement for those amounts paid that are in excess of a reasonable amount for the MRI services they purportedly rendered.

### 1.    Summit Diagnostic's Admitted Cost Per MRI

618.  On February 4, 2013, David W. Williams, Summit Diagnostic's authorized representative, submitted documents to the Michigan Department of Community Health[2] in support of Summit Diagnostic's application for a Certificate of Need to operate a mobile MRI.  *See* Exhibit 22.

619.  Summit Diagnostic stated that the services associated with this Certificate of Need application will begin on April 1, 2013.  Id. at p. 5.

620.  One of the documents submitted in furtherance of Summit Diagnostic's application was a "Projected First Two Years Cash Flow" form that mirrors the "Statement of Revenue and Expense – FSOF, ASC, Freestanding Services, Other" form provided by the Michigan Department of Community Health.  *See* Exhibit 23.

621.  In this document, Summit Diagnostic states that its cost per MRI "Procedure" for "Year 1" is $386.  Id. at p. 2.

---

[2] Now known as the Michigan Department of Health and Human Services.

622.   As Summit Diagnostic was formed on or about November 19, 2012 and the Certificate of Need application references April 2, 2013 as the beginning date of service, "Year 1" in Exhibit 23 is 2013.

623.   In the same document, Summit Diagnostic states that its cost per MRI "Procedure" for "Year 2" (i.e., 2014) is $360.  Id.

624.   Thus, by its admissions in documents submitted to the State of Michigan in 2013, Summit Diagnostic has averred that the costs of treatment (i.e., each MRI "Procedure") to it was $386 in the year 2013 and $360 in the year 2014.

625.   This has been confirmed by Jankowski's own testimony:

> Q:   You've said to me that the MRI costs -- First you didn't really know, you didn't have a breakdown. Then you said the MRI, sounds like pretty definitively you're confident it costs more than $300.  My question is, does it cost under 600?

> A:   I mean, I would say it's under 600 but it's more than 300, so we can definitely agree, but it's fixed cost.

626.   In other words, each MRI performed by Summit Diagnostic and Summit Physicians Group never cost more than $600 by their (and Jankowski's) admission.

**2.   Summit Diagnostic's Charges to Allstate**

627.   Summit Diagnostic submits bills to Allstate using Current Procedural Terminology (CPT) Codes, which are published annually by the American Medical

Association to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

628.   In addition to including the appropriate CPT Code to identify the particular MRI service rendered, Summit Diagnostic's bills to Allstate also include a charge per MRI.

629.   In the years 2013, 2014, and 2015, Summit Diagnostic submitted the following charges to Allstate for its MRI services:

| MRI CPT Code Billed | CPT Code Description | Amount Billed Per MRI |
|---|---|---|
| 70551 | Brain MRI, without contrast | $3,450.00 |
| 72141 | Cervical MRI, without contrast | $3,090.00 |
| 72146 | Thoracic MRI, without contrast | $3,115.00 |
| 72148 | Lumbar MRI, without contrast | $3,075.00 |
| 72195 | Pelvis MRI, without contrast | $3,490.00 |
| 73221 | Upper extremity joint MRI, without contrast | $3,240.00 |
| 73721 | Lower extremity joint MRI, without contrast | $3,315.00 |

*See Exhibit 5 annexed hereto for a chart of bills submitted to Allstate by Summit Diagnostic for MRIs performed in 2013, 2014, and 2015 itemized by patient claim number, patient initials, date of service, MRI CPT Code billed, CPT Code description, and amount billed.*

630.   Thus, Summit Diagnostic billed Allstate a minimum of $3,075 and as much as $3,490 for each MRI it performed in the years 2013, 2014, and 2015.

2:16-cv-13657-BAF-DRG   Doc # 1   Filed 10/13/16   Pg 106 of 178   Pg ID 106

631.   Using Summit Diagnostic's actual cost of $386 per MRI in the year 2013, its charges to Allstate in 2013 were almost eight (8) times and as much as nine (9) times its cost.

632.   Using Summit Diagnostic's projected cost of $360 per MRI in the year 2014, its charges to Allstate in 2014 were at least eight (8) times and as much as nine (9) times its cost.

633.   As itemized in the chart annexed hereto at Exhibit 5, Summit Diagnostic billed Allstate for 13 MRIs in the year 2013.

634.   By Summit Diagnostic's admission, the cost to it for these 13 MRIs was $5,018 (13 x $386).

635.   Summit Diagnostic billed Allstate in the amount of $42,960 for the 13 MRIs performed in 2013.  *See* Exhibit 5.

636.   Thus, Summit Diagnostic's costs for the MRIs performed in 2013 represent 11.7% of the total amount it billed Allstate.

637.   Summit Diagnostic billed Allstate at least $2,704 more than its cost per MRI and in some instances Summit Diagnostic billed Allstate $3,064 more than its cost per MRI in 2013.

638.   In other words, the defendants were able to generate at least $2,704 and in some cases $3,064 in profit for each MRI performed by Summit Diagnostic.

639.   Even if Allstate were to use the higher $600 MRI cost testified to by Jankowski, Summit Diagnostic's costs for the MRIs performed in 2013 would represent 18.2% of the total amount it billed Allstate.

640.   As itemized in the chart annexed hereto at Exhibit 5, Summit Diagnostic billed Allstate for 22 MRIs in the year 2014.

641.   By Summit Diagnostic's admission, the cost to it for these 22 MRIs was $7,920 (22 x $360).

642.   Summit Diagnostic billed Allstate in the amount of $69,605 for the 22 MRIs performed in 2014.  *See* Exhibit 5.

643.   Thus, Summit Diagnostic's costs for the MRIs performed in 2014 represents 11.4% of the total amount it billed Allstate.

644.   Summit Diagnostic billed Allstate between $2,715 and $2,955 more than its costs per MRI in 2014.

645.   In other words, the defendants were able to generate at least $2,715 and in some cases $2,955 in profit for each MRI performed by Summit Diagnostic.

646.   Even if Allstate were to use the higher $600 MRI cost testified to by Jankowski, Summit Diagnostic's costs for the MRIs performed in 2014 would represent 19.0% of the total amount it billed Allstate.

647.   As itemized in the chart annexed hereto at Exhibit 5, Summit Diagnostic billed Allstate for 11 MRIs in the year 2015.

648.   Even assuming the higher cost per MRI admitted by Summit Diagnostic ($386), the cost to it for these 11 MRIs was $4,246 (11 x $386).

649.   Summit Diagnostic billed Allstate in the amount of $35,560 for the 11 MRIs performed in 2015.  *See* Exhibit 5.

650.   Thus, Summit Diagnostic's costs for the MRIs performed in 2015 represent 11.9% of the total amount it billed Allstate.

651.   Summit Diagnostic billed Allstate between $2,704 and $3,104 more than its cost per MRI in 2015.

652.   In other words, the defendants were able to generate at least $2,704 and in some cases $3,104 in profit for each MRI performed by Summit Diagnostic.

653.   Even if Allstate were to use the higher $600 MRI cost testified to by Jankowski, Summit Diagnostic's costs for the MRIs performed in 2015 would represent 18.5% of the total amount it billed Allstate.

654.   For the years 2013, 2014, and 2015, Summit Diagnostic billed Allstate in excess of $148,125 for a total of 46 MRIs that cumulatively cost it no more than $17,184.

655.   The total amount billed to Allstate by Summit Diagnostic is more than eight (8) times Summit Diagnostic's costs for MRIs performed in the years 2013 through 2015.

656.   It is untenable that the Michigan No-Fault Act was enacted to permit such gross exploitation of the benefits available thereunder.

657.   Indeed, such excessive charges stand in stark contrast to the established public policy in Michigan that the No-Fault Act should not increase the cost of healthcare treatment, as discussed *supra*.

658.   Summit Diagnostic's charges are not and were not reasonable and Summit Diagnostic cannot sustain its burden of proving otherwise.

### 3.   <u>Summit Physicians Group's Admitted Cost Per MRI</u>

659.   On June 4, 2013, David W. Williams, Summit Physician Group's authorized representative, submitted documents to the Michigan Department of Community Health in support of Summit Physicians Group's application for a Certificate of Need to acquire the mobile MRI host site from Universal Imaging, Inc. *See* Exhibit 24.

660.   On December 5, 2012, Summit Diagnostic entered into a lease agreement with Mobile MRI Rental Services, PLLC to lease a mobile MRI unit "24 hours per day, seven (7) days per week during the term of the lease at 19699 East 8 Mile, St. Clair Shores, Michigan 48080 or, at Lessee's election, at 8555 N. Silvery Lane, Dearborn Heights, Michigan." *See* Exhibit 25.

661.   Jankowski executed the lease agreement on behalf of Summit Diagnostic as its Authorized Agent, and Giancarlo executed the lease agreement on behalf of Mobile MRI Rental Services, LLC as its Manager.  Id.

662.   As the same mobile MRI magnet is used by Summit Diagnostic and Summit Physicians Group, the cost to perform an MRI for Summit Physicians Group is no different than the self-admitted cost per MRI for Summit Diagnostic.

663.   Furthermore, Jankowski has testified that his cost per MRI is under $600:

> Q:   You've said to me that the MRI costs -- First you didn't really know, you didn't have a breakdown. Then you said the MRI, sounds like pretty definitively you're confident it costs more than $300.  My question is, does it cost under 600?
>
> A:   I mean, I would say it's under 600 but it's more than 300, so we can definitely agree, but it's fixed cost.

664.   In other words, each MRI performed by Summit Physicians Group never cost more than $600.

665.   Thus, by Jankowski's own admissions, Summit Physicians Group's cost per MRI in 2013, 2014, 2015, and 2016 to date was never higher than $600.

### 4.   Summit Physicians Group's Charges to Allstate

666.   Summit Physicians Group submits bills to Allstate using CPT Codes.

667.   In addition to including the appropriate CPT Code to identify the particular MRI service rendered, Summit Physicians Group's bills to Allstate also include a charge per MRI.

668.   In the years 2013, 2014, 2015, and 2016 to date, Summit Physicians Group submitted the following charges to Allstate for its MRI services:

| MRI CPT Code Billed | CPT Code Description | Amount Billed Per MRI |
|---|---|---|
| 70336 | Jaw MRI, without contrast | $3,425.00 |
| 70551 | Brain MRI, without contrast | $3,450.00 to $5,400.00 |
| 71550 | Chest MRI, without contrast | $3,800.00 |
| 72141 | Cervical MRI, without contrast | $3,090.00 to $5,400.00 |
| 72146 | Thoracic MRI, without contrast | $3,115.00 |
| 72148 | Lumbar MRI, without contrast | $3,075.00 to $5,400.00 |
| 72195 | Pelvis MRI, without contrast | $3,490.00 |
| 73218 | Upper extremity MRI, without contrast | $3,320.00 |
| 73221 | Upper extremity joint MRI, without contrast | $3,140.00 to $5,000.00 |
| 73222 | Upper extremity joint MRI, with contrast | $3,515.00 |
| 73718 | Lower extremity MRI, without contrast | $3,360.00 |
| 73721 | Lower extremity joint MRI, without contrast | $3,315.00 to $5,000.00 |
| 74181 | Abdomen MRI, without contrast | $3,055.00 |

*See Exhibit 26 annexed hereto for a chart of bills submitted to Allstate by Summit Physicians Group for MRIs performed in 2013, 2014, 2015, and 2016 to date itemized by patient claim number, patient initials, date of service, MRI CPT Code billed, CPT Code description, and amount billed.*

111

669.   Thus, Summit Physicians Group billed Allstate a minimum of $3,055 and as much as $5,400 for each MRI it performed in the years 2013, 2014, 2015, and 2016 to date.

670.   Because Jankowski admitted under oath that he is part of a group that owns the magnet used for MRIs and that the cost per MRI is less than $600 but greater than $300 (as set out *supra*), Allstate will use Summit Diagnostic's actual cost of $386 per MRI in the year 2013.

671.   Using this figure, Summit Physicians Group's charges to Allstate in 2013 were almost eight (8) times and as much as nine (9) times its cost.

672.   Again, using Summit Diagnostic's projected cost of $360 per MRI in the year 2014, Summit Physicians Group's charges to Allstate in 2014 were at least eight (8) times and as much as nine (9) times its cost.

673.   As itemized in the chart annexed hereto at Exhibit 26, Summit Physicians Group billed Allstate for 41 MRIs in the year 2013.

674.   By Jankowski's own admission, the cost to Summit Physicians Group for these 40 MRIs was $15,440 (40 x $386).

675.   Summit Physicians Group billed Allstate in the amount of $129,695 for the 40 MRIs performed in 2013.  *See* Exhibit 26.

676.   Thus, Summit Physicians Group's costs for the MRIs performed in 2013 represent 11.9% of the total amount it billed Allstate.

677.   Summit Physicians Group billed Allstate at least $2,704 more than its cost per MRI and in some instances Summit Physicians Group billed Allstate $3,064 more than its cost per MRI in 2013.

678.   In other words, the defendants were able to generate at least $2,704 and in some cases $3,064 in profit for each MRI performed by Summit Physicians Group.

679.   Even if Allstate were to use the higher $600 MRI cost testified to by Jankowski, Summit Physicians Group's costs for the MRIs performed in 2013 would represent 18.3% of the total amount it billed Allstate.

680.   As itemized in the chart annexed hereto at Exhibit 26, Summit Physicians Group billed Allstate for 88 MRIs in the year 2014.

681.   By Jankowski's own admission, the cost to Summit Physicians Group for these 88 MRIs was $31,680 (88 x $360).

682.   Summit Physicians Group billed Allstate in the amount of $280,585 for the 88 MRIs performed in 2014.  *See* Exhibit 26.

683.   Thus, Summit Physicians Group's costs for the MRIs performed in 2014 represents 11.3% of the total amount Summit Physicians Group billed Allstate.

684.   Summit Physicians Group billed Allstate between $2,715 and $2,955 more than its costs per MRI in 2014.

685.   In other words, the defendants were able to generate at least $2,715 and in some cases $2,955 in profit for each MRI performed by Summit Physicians Group.

686.   Even if Allstate were to use the higher $600 MRI cost testified to by Jankowski, Summit Physicians Group's costs for the MRIs performed in 2014 would represent 18.9% of the total amount it billed Allstate.

687.   As itemized in the chart annexed hereto at Exhibit 26, Summit Physicians Group billed Allstate for 55 MRIs in the year 2015.

688.   Even assuming the higher cost per MRI admitted by Summit Diagnostic ($386), the cost to Summit Physicians Group for these 55 MRIs was $21,230 (55 x $386).

689.   Summit Physicians Group billed Allstate in the amount of $186,980 for the 55 MRIs performed in 2015.  *See* Exhibit 26.

690.   Thus, Summit Physicians Group's costs for the MRIs performed in 2015 represent 11.4% of the total amount it billed Allstate.

691.   Summit Physicians Group billed Allstate between $2,689 and $5,014 more than its cost per MRI in 2015.

692.   In other words, the defendants were able to generate at least $2,689 and in some cases $5,014 in profit for each MRI performed by Summit Physicians Group.

693.   Even if Allstate were to use the higher $600 MRI cost testified to by Jankowski, Summit Physicians Group's costs for the MRIs performed in 2015 would represent 17.6% of the total amount it billed Allstate.

694.   As itemized in the chart annexed hereto at Exhibit 26, Summit Physicians Group billed Allstate for 11 MRIs in the year 2016 to date.

695.   Even assuming the higher cost per MRI admitted by Summit Diagnostic ($386), the cost to Summit Physicians Group for these 11 MRIs was $4,246 (11 x $386).

696.   Summit Physicians Group billed Allstate in the amount of $35,655 for the 11 MRIs performed in 2016 to date.  *See* Exhibit 26.

697.   Thus, Summit Physicians Group's costs for the MRIs performed in 2016 to date represent 11.9% of the total amount it billed Allstate.

698.   Summit Physicians Group billed Allstate between $2,689 and $2,974 more than its cost per MRI in 2016 to date.

699.   In other words, the defendants were able to generate at least $2,689 and in some cases $2,974 in profit for each MRI performed by Summit Physicians Group.

700.   Even if Allstate were to use the higher $600 MRI cost testified to by Jankowski, Summit Physicians Group's costs for the MRIs performed in 2016 to date would represent 18.6% of the total amount it billed Allstate.

701.   The total amount billed to Allstate by Summit Physicians Group is more than eight (8) times and in some cases more than thirteen (13) times Summit Physicians Group's costs for MRIs performed in the years 2013 through 2016 to date.

702.   It is untenable that the Michigan No-Fault Act was enacted to permit such gross exploitation of the benefits available thereunder.

703.   Indeed, such excessive charges stand in stark contrast to the established public policy in Michigan that the No-Fault Act should not increase the cost of healthcare treatment, as discussed *supra*.

704.   Summit Physicians Group's charges are not and were not reasonable and Summit Physicians Group cannot sustain its burden of proving otherwise.

### 5.   <u>Summit Diagnostic's and Summit Physicians Group's Charges Far Exceed the Amounts Paid by Other Michigan Payors</u>

705.   In addition to their charges being unreasonable and excessive based on its admitted-to costs, Summit Diagnostic's and Summit Physicians Group's charges are also grossly excessive when compared to other prominent Michigan payors.

706.   For example, Medicare reimbursed for MRIs performed in Macomb, Oakland, and Wayne counties at the following amounts for MRIs performed from 2013 through 2016 to date:

|  | 2013 | 2014 | 2015A | 2015B | 2016 |
|---|---|---|---|---|---|
| **CPT Code 70551** | $449.62 | $251.63 | $230.15 | $231.30 | $232.01 |
| **CPT Code 72141** | $398.99 | $250.02 | $244.06 | $224.52 | $225.73 |
| **CPT Code 72146** | $399.69 | $250.02 | $223.40 | $224.52 | $225.73 |
| **CPT Code 72148** | $393.78 | $250.59 | $222.33 | $223.44 | $224.66 |
| **CPT Code 72195** | $444.94 | $387.57 | $375.63 | $377.50 | $376.62 |
| **CPT Code 73221** | $291.45 | $261.79 | $235.81 | $236.99 | $237.80 |
| **CPT Code 73721** | $291.45 | $262.15 | $325.45 | $236.63 | $238.16 |

707.   Michigan Medicaid reimbursed for MRIs performed from 2013 through 2016 to date at the following amounts:

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| **CPT Code 70551** | $274.53 | $274.53 | $127.77 | $128.37 |
| **CPT Code 72141** | $333.37 | $277.71 | $124.01 | $124.80 |
| **CPT Code 72146** | $303.46 | $303.46 | $124.01 | $124.80 |
| **CPT Code 72148** | $300.27 | $300.27 | $123.22 | $124.21 |
| **CPT Code 72195** | $270.97 | $270.97 | $208.60 | $208.80 |
| **CPT Code 73221** | $266.81 | $266.81 | $130.75 | $131.54 |
| **CPT Code 73721** | $266.81 | $266.81 | $130.75 | $131.74 |

708.   The Michigan worker's compensation program reimburses MRIs performed from 2013 through 2016 to date at the following amounts:

117

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| **CPT Code 70551** | $274.53 | $274.53 | $127.77 | $128.37 |
| **CPT Code 72141** | $333.37 | $277.71 | $124.01 | $124.80 |
| **CPT Code 72146** | $303.46 | $303.46 | $124.01 | $124.80 |
| **CPT Code 72148** | $300.27 | $300.27 | $123.22 | $124.21 |
| **CPT Code 72195** | $270.97 | $270.97 | $208.60 | $208.80 |
| **CPT Code 73221** | $266.81 | $266.81 | $130.75 | $131.54 |
| **CPT Code 73721** | $266.81 | $266.81 | $130.75 | $131.74 |

709.   Allstate is not suggesting that it should pay only what other Michigan payors pay for MRIs.

710.   However, the reimbursement amounts from other payors are indicative of the range for what a reasonable charge is.

711.   Summit Diagnostic's and Summit Physicians Group's charges are well outside this range and the spectrum of reasonableness.

## C.   EXCESSIVELY CHARGED PRESCRIPTION MEDICATION

712.   In addition to referring patients for the medically unnecessary treatment discussed *supra*, Summit Physicians Group, Summit Medical, Greater Detroit PT, Jankowski, Lerner, and other doctors associated with Summit Physicians Group and Summit Medical prescribed and directly provided substantial amounts of pharmaceuticals to patients at issue in this Complaint.

713.   Lerner has already admitted to his participation in a similar scheme to defraud Medicare by submitting or causing to submit bills for medically unnecessary prescription medications that, in some cases, were never dispensed to his patients:

> Q:   Okay.  And that's the case even though part of the federal fraud scheme of Medicare specifically talks about you committing I believe it was over a million, but we'll go back to it to be sure I'm accurate, in unnecessary not only excessive, it says cause pharmacies to be billed for unnecessary prescription medications.  And it specifically said you were charging excessive fees for medications, and it looks like for thousands of patients and some of which were never even provided at all.
>
> And, again, you stand by what's written in the plea agreement that you signed in the presence of your lawyer?
>
> A:   Yes.

714.   Lerner was "a frequent prescriber of expensive name brand drugs" and "ranks within the top 10 in several expensive non-controlled medications in the State of Michigan[.]"  *See* Exhibit 11 at ¶ 21(d).

715.   Indeed, "[i]n one month, January 2013, Dr. Lerner prescribed 15,401 units of Schedule II drugs, such as Oxycodone, which averages 496 units per day."  Id. at ¶ 23.

716.   Much like how Lerner targeted Medicare, the defendants targeted No-Fault auto insurers such as Allstate when prescribing pharmaceuticals as evidenced by Summit Medical's own prescription form.

717.   Summit Medical's prescription form contains pre-printed boxes indicating whether the claims will be paid by a Michigan No-Fault insurer such as Allstate or under Michigan's Workers Compensation schedules.  *See* Exhibit 27.

718.   There are no other options other than "Auto" and "Work Comp" on the preprinted form.  Id.

719.   Furthermore, the prescription medication claims submitted by Summit Physicians Group and Summit Medical to Allstate under Michigan's No-Fault Act often contain charges near or above the national average wholesale price ("AWP") for repackaged drugs, a grossly excessive and unreasonable number.

720.   Jankowski testified how the defendants came up with the prescription medication charges:

> A:   We basically take the average wholesale price which is published on the computer.  We use instead of a multiplier we use like 80 percent of the average wholesale price.  That is that day on the computer of that drug.  So we'll use less than one times average wholesale price.

721.   The charges for prescription medications dispensed by the defendants are excessive when compared to pricing from local Michigan pharmacies for the same drugs:

| NDC | Drug | Units | Local Michigan Pharmacy Charge | Amount Billed to Allstate |
|---|---|---|---|---|
| 33261-061-90 | Ibuprofen Tablet 600mg | 60 | $3.64 for 30 | $28.00 |
| 33261-061-90 | Ibuprofen Tablet 600mg | 90 | $3.64 for 30 | $40.00 |
| 33261-005-30 | Alprazolam Tablet 1mg | 30 | $14.51 for 60 | $87.82 |
| 33261-105-90 | Tramadol Hydrochloride Tablet, Coated 50mg | 90 | $15.32 for 60 | $109.44 |
| 33261-483-90 | Tramadol Hydrochloride Tablet 50mg | 90 | $15.32 for 60 | $109.44 |
| 33261-033-90 | Cyclobenzaprine Hydrochloride Tablet 10mg | 90 | $4.00 for 30 | $125.50 |
| 33261-073-30 | Mirtazapine Tablet 15mg | 30 | $17.24 | $130.38 |
| 33261-173-30 | Zolpidem Tartrate Tablet 10mg | 30 | $12.20 | $130.38 |
| 33261-055-60 | Hydrocodone Bitartrate and Acetaminophen Tablet 325mg | 60 | $28.06 for 120 | $155.64 |
| 33261-049-90 | Gabapentin Capsule 300mg | 90 | $17.50 | $165.00 |
| 33261-087-60 | Omeprazole Capsule 20mg | 60 | $15.79 | $358.00 |

722. "[A] no-fault insurer is not liable for the amount of any charge that exceeds the health-care provider's customary charge for a like product, service, or accommodation in a case not involving insurance." Hofmann v. Auto Club Ins. Ass'n, 211 Mich. App. 55, 103 (1995).

723. Furthermore, Summit Medical bills Allstate at a much higher rate than it does its cash patients.

724. Such a practice is in clear violation of Michigan law prohibiting providers from charging different amounts based on the paying source.

121

725.  For example, Summit Medical billed Allstate $668.20 for four (4) medications (Omerprazole, Hydrocodone/Acetaminophen, Tramadol, and Naproxen) dispensed to Patient E.H. on October 8, 2014.  *See* Exhibit 28.

726.  However, according to an invoice submitted by Summit Medical to Allstate, Summit Medical billed Patient E.H. only $9.99 for the four (4) medications dispensed on October 8, 2014.  *See* Exhibit 29.

727.  Allstate is not obligated to pay a charge that does not comport with all applicable Michigan law, including being both reasonable and customary to what the provider charges all other payors for the same service.

728.  As evidenced by Jankowski's own emails and documents submitted to Allstate, the defendants specifically targeted No-Fault carriers and submitted exaggerated claims for reimbursement they were not entitled to.

729.  Allstate is not required to reimburse the defendants for medications prescribed and dispensed for the purpose of inflating claims to Allstate.

IX.   **FRAUDULENT BILLING PRACTICES**

730.  Providers like Summit Physicians Group, Summit Medical, and Greater Detroit PT each have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

731.   Summit Physicians Group, Summit Medical, and Greater Detroit PT, by and through the individual defendants, failed to meet their responsibility and instead submitted demands for unreasonable payments to Allstate for medically unnecessary and excessive services.

732.   Summit Physicians Group, Summit Medical, and Greater Detroit PT also submitted claims to Allstate through the U.S. Mail for services billed using the fraudulent billing practice of unbundling, a practice used to increase the amount charged for each patient visit.

733.   CMS instituted the National Correct Coding Initiative ("NCCI") to promote national correct coding methodologies and to control improper coding leading to inappropriate payment for Medicare Part B claims.

734.   There are two NCCI edit tables: "Column One/Column Two Correct Coding Edit Table" and "Mutually Exclusive Edit Table."

735.   Each edit table has a Column One and Column Two HCPCS/CPT Code.

736.   Each edit table contains edits, which are pairs of HCPCS/CPT Codes that should not be reported together because the services (and reimbursement) of the Column Two code is subsumed by the services (and reimbursement) for the Column One code.

737.   Violation of the edits (billing a Column One code and a Column Two code on the same day for the same claimant) is known as "unbundling," which occurs when a provider bills separately for individual components of a procedure which are included in another billing code also billed for the same date of service.

738.   If a provider reports the two codes of an edit pair, the Column Two code is denied and the Column One code is eligible for payment.

739.   For several of the claims at issue in the within Complaint, Summit Physicians Group, Summit Medical, and Greater Detroit PT submitted reimbursement claims to Allstate through the U.S. Mail seeking payment for the injection of lidocaine during trigger point injection and arthrocentesis procedures.

740.   Trigger points are focal areas of muscle spasms or inflammation.

741.   A trigger point injection is typically an injection of an anesthetic such as lidocaine or a mixture of anesthetics that is given directly into a trigger point for pain management.

742.   Summit Physicians Group and Summit Medical each billed Allstate using CPT Code 20552 (*"Injection(s); single or multiple trigger point(s), 1 or 2 muscles"*) and/or CPT Code 20553 (*"Injection(s); single or multiple trigger point(s), 3 or more muscle(s)"*) for several patients at issue in this Complaint. *See* Exhibit 30.

743.   Summit Physicians Group and Summit Medical each also billed Allstate using HCPCS Code J2001 indicating the injection of "lidocaine" or an anesthetic mixture containing lidocaine during the same date of service as the trigger point procedure.

744.   As of July 1, 2004, HCPCS J2001 cannot be reported on the same date of service for the same patient as CPT Codes 20552 or 20553 without an appropriate modifier (which was never appropriate in any of the instances in which Allstate was billed).

745.   The submission of these codes for the same patient on the same date of service represents unbundling.

746.   Here, Summit Physicians Group and Summit Medical submitted or caused to be submitted to Allstate at least 230 bills containing both HCPCS J2001 and CPT Codes 20552 or 20553 for the same patient on the same date of service, as demonstrated by the representative patients on the chart annexed hereto at Exhibit 30.

747.   As documented on the chart annexed hereto at Exhibit 30, the defendants engaged in at least 230 instances of fraudulently unbundling HCPCS J2001 from CPT Codes 20552 or 20553.

748.   Summit Physicians Group, Summit Medical, and Greater Detroit PT each also billed Allstate using CPT Code 20610 (*"Arthrocentesis, aspiration and/or*

*injection; major joint or bursa (eg, shoulder, hip, knee joint, subacromialbursa")* for several patients at issue in this Complaint.

749.   Arthrocentesis or "joint aspiration" is a procedure in which a sterile needle and syringe are used to obtain fluid for diagnostic lab testing, to alleviate pressure and relieve joint pain, or both.

750.   Summit Physicians Group, Summit Medical, and Greater Detroit PT each also billed Allstate using HCPCS Code J2001 indicating the injection of "lidocaine" or an anesthetic mixture containing lidocaine during the same date of service as the arthrocentesis procedure.

751.   As of July 1, 2004, HCPCS J2001 cannot be reported on the same date of service for the same patient as CPT Code 20610 without an appropriate modifier (which was never appropriate in any of the instances in which Allstate was billed).

752.   The submission of these codes for the same patient on the same date of service represents unbundling.

753.   Here, Summit Physicians Group, Summit Medical, and Greater Detroit PT submitted or caused to be submitted to Allstate at least 110 bills containing both HCPCS J2001 and CPT Code 20610 for the same patient on the same date of service, as demonstrated by the representative patients on the chart annexed hereto at Exhibit 31.

754.   As documented on the chart annexed hereto at Exhibit 31, the defendants engaged in at least 110 instances of unbundling HCPCS J2001 from CPT Code 20610.

755.   The prevalence of the defendants' unbundling in this regard evidences that it was a regular practice that was knowingly and intentionally done.

756.   Unbundling that is done knowingly and intentionally constitutes a fraudulent billing practice.

## X.   SPECIFIC ALLEGATIONS OF MISREPRESENTATIONS MADE TO AND RELIED ON BY ALLSTATE

### A.   MISREPRESENTATIONS BY THE DEFENDANTS

757.   To induce Allstate to pay promptly their fraudulent charges for unnecessary medical services, the defendants submitted or caused to be submitted to Allstate false medical documentation that materially misrepresented that the medical services they referred and provided were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

758.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a).

127

759.   Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

760.   There are no less than ten (10) separate reasons why the defendants' alleged treatment was in fact not necessary or lawful (and, therefore, was fraudulently billed to Allstate):

a.   The defendants utilized an unlawful predetermined treatment protocol for patients at issue in this Complaint.  As evidenced by the email attached hereto as Exhibit 1, Jankowski laid out to several parties exactly what treatment the defendants would subject all patients to: "PT, PT post of [sic], MRI, x-ray EKG nerve conduction studies, VNG."  Jankowski also stated in the email the reason why these treatments would be used on all patients, as these "services can make a very profitable number for all involved and the numbers are staggering and well worth the effort."  Id.  Not only is it clear from Jankowski's email that each patient would be treated according to a predetermined treatment protocol, this pattern of unlawful and medically unnecessary treatment is also confirmed by the substantially similar treatment rendered to patients at issue in this Complaint, treatment plans that have no bearing on medical necessity or any patient-specific considerations.

b.   The defendants benefitted from several *quid pro quo* relationships with laypersons, solicitation hotlines, and other providers.  As with their predetermined treatment protocol, the defendants' method of obtaining patients did not include considerations of medical necessity.  *See, e.g.,* Exhibits 2, 9, and 10.  The defendants also utilized hotlines that solicited motor vehicle accident victims.  Id.  The defendants participated in numerous *quid pro quo* relationships that derived profit for

themselves without regard for the necessity and lawfulness of medical treatment.

c.     Almost all of the patients at issue in this Complaint were found to have significant symptom magnification and differences in presentation of symptoms when comparing emergency room/primary care physician evaluations to the initial evaluation at Summit Physicians Group, Summit Medical, and Greater Detroit PT. For example, the emergency room/primary care records almost always indicate a low-level motor vehicle accident and that the patient suffered a minor, fairly localized injury, whereas the defendants' medical records for the same patients indicate that a high-speed accident occurred and that patients were more seriously injured. The defendants frequently used exaggerated language to describe patients' symptoms and accidents, such as "severe," "multi-level," "intractable," "post-traumatic," and "traumatically-induced." The use of such exaggerated adjectives to describe the patients' conditions is often in stark contrast to the documentation of other providers who treated patients post-accident. The defendants also magnified diagnoses in an attempt to justify their unnecessary treatment. The use of more severe diagnoses often preceded the use of invasive therapy by the defendants, thereby confirming that the defendants inflated symptoms and diagnoses to falsely justify aggressive treatment. Symptom and diagnosis magnification was universal in the records of the patients at issue herein, confirming that the defendants intentionally misrepresented their patients' injuries. Treatment rendered based on the exaggerated symptoms and diagnoses made by the defendants is not necessary treatment for their patients' care, recovery, or rehabilitation.

d.     The defendants provided patients with a slew of prescription narcotics and various other medically unnecessary medications upon each patient's presentment to Summit Physicians Group, Summit Medical, and Greater Detroit PT, regardless of each individual patient's medical needs and clinical history. The defendants not only illegally billed Allstate for unnecessary medications that were prescribed to "hook" patients, they did so at the expense of the care and safety of their patients. In addition

to the highly-addictive opioids and other narcotics frequently prescribed and dispensed by Summit Medical Group, Summit Physicians Group, Greater Detroit PT, Jankowski, and Lerner, patients at issue in this Complaint were also prescribed and dispensed medications that were unnecessary as they were not related to the motor vehicle accident and/or dispensed without any medical justification. In other words, Summit Medical Group, Summit Physicians Group, Greater Detroit PT, Jankowski, and Lerner prescribed and dispensed prescription medications that were based on an "in case you need it" assessment instead of actual need. The defendants prescribed and dispensed medically unnecessary medications for the purpose of "hooking" patients and submitting excessive charges to Allstate.

e.   The physical therapy prescribed by the defendants also violated established standards of care. A patient's subjective complaints of pain are not sufficient to justify more than a few weeks of physical therapy. However, Summit Physicians Group, Summit Medical, Greater Detroit PT, Jankowski, and Lerner often prescribed extensive physical therapy based upon a patient's subjective symptoms alone. These defendants routinely reported essentially normal findings in patient examinations yet entered diagnoses unsupported by the physical exam that purported to justify extensive physical therapy. In fact, the defendants' physical exams and findings for each patient were strikingly similar, indicating that the exams were *pro forma* and merely attempts to justify unnecessary treatment, instead of an attempt to identify each patient's unique symptomology and clinical needs. Jankowski and Lerner repeatedly made misrepresentations regarding the necessity for physical therapy, including almost every time each wrote a prescription for physical therapy, in order to perpetuate unnecessary and expensive treatment. These false statements, including Jankowski's and Lerner's prescriptions for physical therapy, supports that the physical therapy was not related to the care, recovery, or rehabilitation of the patient, thus rendering such physical therapy medically unnecessary and not compensable under Michigan's No-Fault Act.

130

f.      The electrodiagnostic testing referred and performed by the defendants was unnecessary and problematic in several respects. First, such testing was not warranted or indicated based on the referring physician defendants' own findings and each patient's symptoms.  Second, the electrodiagnostic testing that was done was excessive, was not likely performed as billed, and the results of which contain unsupported and incredible results.  Finally, the EMG and NCS that were done did not in any way affect patient treatment, thus rendering them clinically useless.  That is, the results were not used to create, adjust, or direct each patient's treatment plan.  Indeed, in several instances, the defendants established a treatment plan before electrodiagnostic testing was ordered and before the results of the testing were known.  These treatment plans almost never changed even after the EMG/NCS results came back.  Allstate is not required under Michigan's No-Fault Act to compensate the defendants for EMG and NCS studies that were not medically necessary and had no clinical utility.

g.      The defendants subjected their patients to a battery of unnecessary ESI, bilateral facet joint injections, and other injection-related procedures.   The defendants resorted to rendering ESI to several patients at issue in this Complaint as a matter of course.  Allstate is not required to reimburse the defendants for medically unnecessary ESI treatment that was only recommended and performed to bolster claims submitted to Allstate.  Summit Medical and Summit Physicians Group each also billed Allstate for P-Stim treatment and routinely submitted medical records stating "the ear was prepped and draped in a usual sterile fashion" and that the "pins were inserted along the previously marked sites" in an attempt to justify performing these procedures in a surgical center, even though P-Stim is only approved as an acupuncture procedure by the FDA. Furthermore, P-Stim has not been shown to be as beneficial as or more beneficial than traditional forms of treatment modalities. Allstate is not required to reimburse the defendants for medically unnecessary procedures such as the application of P-Stim to patients.

131

h.    Summit Physicians Group unlawfully performed unnecessary MRI scans and submitted bills to Allstate through the U.S. Mail seeking to collect payment for services that are non-compensable under the Michigan No-Fault Act. Summit Physicians Group failed to obtain the necessary licensure from the State of Michigan to lawfully perform MRIs until August 28, 2013. Summit Physicians Group billed Allstate for thirteen (13) MRIs prior to its licensing approval totaling in excess of $42,360. *See* Exhibit 15. According to Mich. Comp. Laws § 333.22247(3), "[a] person shall not charge to, or collect from, another person or otherwise recover costs for services provided or for equipment or facilities that are acquired in violation of this part. If a person has violated this subsection, in addition to the sanctions provided under subsection (2), the person shall, upon request of the person from whom the charges were collected, refund those charges, either directly or through a credit on a subsequent bill." Allstate is not required to compensate Summit Physicians Group for the performance of MRI scans without a license.

i.    The MRI referrals made by the defendants were unnecessary and fraudulent because the referrals were made in furtherance of the scheme to bill Allstate for as many ancillary services as possible, in furtherance of their *quid pro quo* relationships, and not based on the individual needs of the patient. According to Summit Diagnostic's admissions to the State of Michigan, Jankowski, Lerner, Crawford, and Giancarlo were responsible for more than 90% of the MRIs Summit Diagnostic performed in 2013; more than 74% of the MRIs Summit Diagnostic performed in 2014; and more than 75% of the MRIs Summit Diagnostic performed in 2015. *See* Exhibits 16, 17, and 18. According to Summit Physicians Group's admissions to the State of Michigan, Jankowski, Lerner, Crawford, and Giancarlo were responsible for more than 99% of the MRIs Summit Physicians Group performed in 2013; more than 92% of the MRIs Summit Physicians Group performed in 2014; and more than 93% of the MRIs Summit Physicians Group performed in 2015. *See* Exhibits 19, 20, and 21. MRI referrals based on a pecuniary interest and not based on the patients' actual clinical needs are not compensable under Michigan's No-Fault Act. The MRIs at issue herein were performed solely to increase the profit realized

132

by the defendants per patient and not for any patient specific reason.

j.    Providers like Summit Physicians Group, Summit Medical, and Greater Detroit PT each have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services. Summit Physicians Group, Summit Medical, and Greater Detroit PT, by and through the individual defendants, failed to meet their responsibility and instead submitted demands for unreasonable payments to Allstate for medically unnecessary and excessive services. Summit Physicians Group, Summit Medical, and Greater Detroit PT also submitted claims to Allstate through the U.S. Mail for services billed using the fraudulent billing practice of unbundling, a practice used to increase the amount charged for each patient visit. The prevalence of the defendants' unbundling evidences that it was a regular practice that was knowingly and intentionally done. Unbundling that is done knowingly and intentionally constitutes a fraudulent billing practice and Allstate is not required to compensate the defendants for such charges under the Michigan No-Fault Act.

761.   In fact, the treatment rendered by the defendants was rarely necessary, if it was rendered at all.

762.   As detailed *supra*, the defendants frequently violated established standards of care, reported false findings/results, treated excessively, and rendered treatment without adequate substantiation.

763.   All of these factors negate the necessity of the treatment provided for and referred to others by the defendants.

764.   If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

765.    The foregoing facts – unlawfully obtaining patients, falsifying diagnoses to justify excessive treatment, and misrepresenting the necessity of procedures performed on submitted bills – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

766.    Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment allegedly provided by the defendants unnecessary.

767.    The fact of violations of medical standards is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 3 through 6.

768.    Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act sent to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not medically necessary, as it must be in order to be compensable under Michigan law.

769.    Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading

information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

770.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via the U.S. Mail, the defendants attested to the fact and medical necessity of the visits, examinations, interviews, screenings, testing, procedures, MRIs, and ancillary services for which they billed Allstate.

771.   As the defendants did not render reasonably necessary medical treatment, and misrepresented the procedures purportedly performed, each bill and accompanying documentation submitted by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

772.   As licensed medical professionals, Jankowski, Lerner, Crawford, and Giancarlo were obligated, legally and ethically, to act honestly, with integrity, and in accordance with their professional oaths and pledges.

773.   Each misrepresentation made by Jankowski, Lerner, Crawford, and Giancarlo was in violation of their legal and ethical obligations as healthcare professionals.

### B.   ALLSTATE'S JUSTIFIABLE RELIANCE

774.   The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the accuracy of such documents.

135

775.   At all relevant times, the defendants concealed from Allstate facts regarding the lawfulness and medical necessity of medical services allegedly provided and referred by them to prevent Allstate from discovering that the claims submitted by or on behalf of the defendants were not compensable under the No-Fault Act.

776.   These misrepresentations include submitting false medical documentation, including HICFs, documenting the lawfulness and necessity of medical treatment in order to seek reimbursement under Michigan's No-Fault Act.

777.   Evidence of the fraudulent scheme detailed herein was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

778.   Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme from Allstate, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

779.   In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

780.   Allstate would not have paid these monies had the defendants provided true and accurate information about the necessity of the referrals and medical services provided.

136

781.   As a result, Allstate has paid in excess of $552,818 to Summit Physicians Group, Summit Medical, Summit Diagnostic, and Greater Detroit PT in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for reimbursement under the Michigan No-Fault Act.

## XI.   SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

782.   As discussed above, the referrals, treatment, and services purportedly provided by the defendants were not medically necessary, were unlawful, and/or were fraudulently billed.

783.   The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 3 through 6, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were not necessary and were not lawfully rendered, and also because the defendants engaged in fraudulent billing practices.

784.   This objective necessarily required the submission of claims to Allstate.

785.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service.

786.   All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

787.   Every automobile insurance claim detailed herein involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks, and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as the return of settlement draft duplicates to the insurance carrier's home office for filing.

788.   The fraudulent medical billing scheme detailed herein generated hundreds of mailings.

789.   A chart highlighting representative examples of mail fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 32.

790.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate related to each exemplar patient discussed in this Complaint.

791.   It was within the ordinary course of business for Summit Physicians Group, Summit Medical, Summit Diagnostic, and Greater Detroit PT to submit claims for No-Fault reimbursement to insurance carriers like Allstate through the U.S. Mail.

792. As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

793. Allstate reasonably relied on the submissions it received from Summit Physicians Group, Summit Medical, Summit Diagnostic, and Greater Detroit PT through the U.S. Mail in tendering payment to the Defendant Medical Clinics, including the representative submissions set out in Exhibit 32 annexed hereto and identified in the exemplar claims above.

794. As the defendants agreed to pursue the same criminal objective (namely, mail fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XII.  DAMAGES

795. The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

796. Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $552,818.

797.   Exhibits 33 through 36, annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to the defendants by date, payor, payee, patient claim number, check number, and amount.

798.   Exhibit 33 details payments made by Allstate to Summit Physicians Group since 2013.

799.   Exhibit 34 details payments made by Allstate to Summit Medical since February 6, 2013.

800.   Exhibit 35 details payments made by Allstate to Summit Diagnostic since 2013.

801.   Exhibit 36 details payments made by Allstate to Greater Detroit PT since 2008.

802.   Every claim identified in Exhibits 33 through 36 derives from an Allstate insurance policy.

803.   Allstate's claim for compensatory damages, as set out in Exhibits 33 through 36, does not include payment made with respect to any Assigned Claim Facility claimant.

804.   Every payment identified in Exhibits 33 through 36 was made by Allstate alone and Allstate has not been reimbursed for any of the payments itemized in Exhibits 33 through 36.

805.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of investigation to uncover the fraudulent activities of the defendants and the cost of claims handling/adjustment for claims submitted by the defendants.

806.   Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIII.  CAUSES OF ACTION

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Summit Physicians Group, PLLC Enterprise)**
**Against David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., Kevin**
**Crawford, D.O., and Thomas Giancarlo, D.O.**

807.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 806 set forth above as if fully set forth herein.

808.   Summit Physicians Group, PLLC constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

809.   In connection with each of the claims identified in the within Complaint, David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., Kevin Crawford, D.O., and Thomas Giancarlo, D.O. ("Count I defendants") intentionally caused to be prepared and mailed false medical documentation by Summit

Physicians Group, PLLC, or knew that such false medical documentation would be mailed in the ordinary course of Summit Physicians Group, PLLC's business, or should have reasonably foreseen that the mailing of such false medical documentation by Summit Physicians Group, PLLC would occur, in furtherance of the Count I defendants' scheme to defraud.

810.   The Count I defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 32.

811.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

812.   Policies of insurance were delivered to insureds through the U.S. Mail.

813.   Payments to Summit Physicians Group, PLLC from Allstate were transmitted through the U.S. Mail.

814.   As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Summit Physicians Group, PLLC to collect payment from

Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

815.   David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., Kevin Crawford, D.O., and Thomas Giancarlo, D.O. all held an ownership interest in Summit Physicians Group, PLLC.

816.   David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., and Kevin Crawford, D.O. were involved in rendering and/or facilitating the unlawful and medically unnecessary treatment, when treatment was in fact rendered, at Summit Physicians Group, PLLC.

817.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Summit Physicians Group, PLLC for the benefit of the Count I defendants that would not otherwise have been paid.

818.   The Count I defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I defendants to continue their fraudulent scheme without detection.

819.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

820.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count I defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

821.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Summit Physicians Group, PLLC for the benefit of the Count I defendants.

822.   The Count I defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

823.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

824.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

825.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

826.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

827.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them,

and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Summit Physicians Group, PLLC Enterprise)
### Against David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., Kevin Crawford, D.O., and Thomas Giancarlo, D.O.

828.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 806 set forth above as if fully set forth herein.

829.   Defendants David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., Kevin Crawford, D.O., and Thomas Giancarlo, D.O. ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Summit Physicians Group, PLLC.

830.   The Count II defendants each agreed to further, facilitate, support, and/or operate the Summit Physicians Group, PLLC enterprise.

831.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

832.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Summit Physicians Group, PLLC even though Summit Physicians Group, PLLC was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

833.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

834.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count II defendants' unlawful conduct described herein.

835.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Summit Medical Group, PLLC Enterprise)
### Against David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., and Kevin Crawford, D.O.

836.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 806 set forth above as if fully set forth herein.

837.   Summit Medical Group, PLLC constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

146

838. In connection with each of the claims identified in the within Complaint, David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., and Kevin Crawford, D.O. ("Count III defendants") intentionally caused to be prepared and mailed false medical documentation by Summit Medical Group, PLLC or knew that such false medical documentation would be mailed in the ordinary course of Summit Medical Group, PLLC's business, or should have reasonably foreseen that the mailing of such false medical documentation by Summit Medical Group, PLLC would occur, in furtherance of the Count III defendants' scheme to defraud.

839. The Count III defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 32.

840. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

841. Policies of insurance were delivered to insureds through the U.S. Mail.

842. Payments to Summit Medical Group, PLLC from Allstate were transmitted through the U.S. Mail.

843. As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would

2:16-cv-13657-BAF-DRG   Doc # 1   Filed 10/13/16   Pg 148 of 178   Pg ID 148

be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Summit Medical Group, PLLC to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

844.   David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., and Kevin Crawford, D.O. each held an ownership interest in Summit Medical Group, PLLC.

845.   David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., and Kevin Crawford, D.O. were involved in rendering and/or facilitating the medically unnecessary treatment, when treatment was in fact rendered, at Summit Medical Group, PLLC.

846.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Summit Medical Group, PLLC for the benefit of the Count III defendants that would not otherwise have been paid.

847.   The Count III defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III defendants to continue their fraudulent scheme without detection.

848.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

849.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count III defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

850.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Summit Medical Group, PLLC for the benefit of the Count III defendants.

851.   The Count III defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

852.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III defendants' fraudulent acts.

853.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

854.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

855.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

856.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Summit Medical Group, PLLC Enterprise)
### Against David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., and Kevin Crawford, D.O.

857.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 806 set forth above as if fully set forth herein.

858.   Defendants David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., and Kevin Crawford, D.O. ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Summit Medical Group, PLLC.

859.   The Count IV defendants each agreed to further, facilitate, support, and/or operate the Summit Medical Group, PLLC enterprise.

860.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

861.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Summit Medical Group, PLLC even though Summit Medical

Group, PLLC was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

862.   The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

863.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count IV defendants' unlawful conduct described herein.

864.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Summit Diagnostic Services, PLLC Enterprise)**
**Against David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., Kevin**
**Crawford, D.O., and Thomas Giancarlo, D.O.**

865.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 806 set forth above as if fully set forth herein.

866. Summit Diagnostic Services, PLLC constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

867. In connection with each of the claims identified in the within Complaint, David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., Kevin Crawford, D.O., and Thomas Giancarlo, D.O. ("Count V defendants") intentionally caused to be prepared and mailed false medical documentation by Summit Diagnostic Services, PLLC or knew that such false medical documentation would be mailed in the ordinary course of Summit Diagnostic Services, PLLC's business, or should have reasonably foreseen that the mailing of such false medical documentation by Summit Diagnostic Services, PLLC would occur, in furtherance of the Count V defendants' scheme to defraud.

868. The Count V defendants employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 32.

869. Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

870. Policies of insurance were delivered to insureds through the U.S. Mail.

152

871.   Payments to Summit Diagnostic Services, PLLC from Allstate were transmitted through the U.S. Mail.

872.   As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Summit Diagnostic Services, PLLC to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

873.   David Peter Jankowski, D.O. and Thomas Giancarlo, D.O. controlled Summit Diagnostic Services, PLLC.

874.   David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., and Kevin Crawford, D.O. referred patients to Summit Diagnostic Services, PLLC for medically unnecessary MRI scans that were not used in the advancement of patient treatment.

875.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Summit Diagnostic Services, PLLC for the benefit of the Count V defendants that would not otherwise have been paid.

876.   The Count V defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face

would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V defendants to continue their fraudulent scheme without detection.

877.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

878.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count V defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

879.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Summit Diagnostic Services, PLLC for the benefit of the Count V defendants.

880.   The Count V defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

881.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V defendants' fraudulent acts.

882.   The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

883.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

884.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

885.   By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Summit Diagnostic Services, PLLC Enterprise)**
**Against David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., Kevin Crawford, D.O., and Thomas Giancarlo, D.O.**

886.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 806 set forth above as if fully set forth herein.

887.   Defendants David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., Kevin Crawford, D.O., and Thomas Giancarlo, D.O. ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Summit Diagnostic Services, PLLC.

888.   The Count VI defendants each agreed to further, facilitate, support, and/or operate the Summit Diagnostic Services, PLLC.

155

889.   As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

890.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Summit Diagnostic Services, PLLC even though Summit Diagnostic Services, PLLC was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

891.   The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

892.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VI defendants' unlawful conduct described herein.

893.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Greater Detroit Physical Therapy & Rehabilitation, P.C. Enterprise)
### Against Laran Johnathon Lerner, D.O.

894.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 806 set forth above as if fully set forth herein.

895.   Greater Detroit Physical Therapy & Rehabilitation, P.C. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

896.   In connection with each of the claims identified in the within Complaint, Laran Johnathon Lerner, D.O ("Count VII defendant") intentionally caused to be prepared and mailed false medical documentation by Greater Detroit Physical Therapy & Rehabilitation, P.C., or knew that such false medical documentation would be mailed in the ordinary course of Greater Detroit Physical Therapy & Rehabilitation, P.C.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by Greater Detroit Physical Therapy & Rehabilitation, P.C. would occur, in furtherance of the Count VII defendant's scheme to defraud.

897.   Laran Johnathon Lerner, D.O. is the owner of Greater Detroit Physical Therapy & Rehabilitation, P.C.

898.   David Peter Jankowski, D.O. and Kevin Crawford, D.O. referred patients to Greater Detroit Physical Therapy & Rehabilitation, P.C. for medically unnecessary treatment.

899.   The Count VII defendant employed, knew, or should have foreseen that two or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 32.

900.   Among other things, medical records, bills, invoices, applications for insurance, applications for benefits, and premium checks were delivered to Allstate through the U.S. Mail.

901.   Policies of insurance were delivered to insureds through the U.S. Mail.

902.   Payments to Greater Detroit Physical Therapy & Rehabilitation, P.C. from Allstate were transmitted through the U.S. Mail.

903.   As documented above, the Count VII defendant repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical expenses and/or services that were purportedly performed at and/or by Greater Detroit Physical Therapy & Rehabilitation, P.C. to collect payment from Allstate under the personal injury protection benefits portion of the Allstate policies and applicable provisions of the Michigan No-Fault Act.

904.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Greater Detroit Physical Therapy & Rehabilitation, P.C. for the benefit of the Count VII defendant that would not otherwise have been paid.

905.   The Count VII defendant's pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII defendant to continue his fraudulent scheme without detection.

906.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

907.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count VII defendant engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

908.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Greater Detroit Physical Therapy & Rehabilitation, P.C. for the benefit of the Count VII defendant.

909.   The Count VII defendant participated in the conduct of this enterprise through a pattern of racketeering activities.

910.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII defendant's fraudulent acts.

911.   The Count VII defendant's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

912.   Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of Michigan.

913.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

914.   By virtue of the Count VII defendant's violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted, by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Greater Detroit Physical Therapy & Rehabilitation, P.C. Enterprise)
### Against David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., and Kevin Crawford, D.O.

915.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 806 set forth above as if fully set forth herein.

916.    Defendant Laran Johnathon Lerner, D.O. conspired with defendants David Peter Jankowski, D.O., and Kevin Crawford, D.O. ("Count VIII defendants") to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Greater Detroit Physical Therapy & Rehabilitation, P.C.

917.    The Count VIII defendants each agreed to further, facilitate, support, and/or operate the Greater Detroit Physical Therapy & Rehabilitation, P.C. enterprise.

918.    As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

919.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Greater Detroit Physical Therapy & Rehabilitation, P.C. even though Greater Detroit Physical Therapy & Rehabilitation, P.C. was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

920.    The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

921.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim

payments as a result of the Count VIII defendants' unlawful conduct described herein.

922.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IX**
**COMMON LAW FRAUD**
**Against All Defendants**

923.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 806 set forth above as if fully set forth herein.

924.   The scheme to defraud Allstate perpetrated by David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., Kevin Crawford, D.O., Thomas Giancarlo, D.O., Summit Physicians Group, PLLC, Summit Medical Group, PLLC, Summit Diagnostic Services, PLLC, and Greater Detroit Physical Therapy & Rehabilitation, P.C.   ("Count IX defendants") was dependent upon a succession of material misrepresentations of fact that the defendant medical providers were lawfully rendering medical treatment in compliance with the Michigan No-Fault Act and were entitled to collect benefits thereunder.

925.   The misrepresentations of fact made by the Count IX defendants include, but are not limited to, those material misrepresentations discussed in section IX *supra*.

926.   The Count IX defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

927.   The misrepresentations were intentionally made by the Count IX defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment under the Michigan No-Fault Act would be submitted to Allstate.

928.   The Count IX defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

929.   Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for medical expenses pursuant to No-Fault insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

930.   As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

**COUNT X**
**CIVIL CONSPIRACY**
**Against All Defendants**

931.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 806 set forth above as if fully set forth herein.

932.   Defendants David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., Kevin Crawford, D.O., Thomas Giancarlo, D.O., Summit Physicians Group, PLLC, Summit Medical Group, PLLC, Summit Diagnostic Services, PLLC, and Greater Detroit Physical Therapy & Rehabilitation, P.C. ("Count X defendants") combined and concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for reimbursement under the No-Fault Act to which they were not entitled because (1) the defendants did not provide reasonably necessary medical treatment, (2) the defendants did not lawfully render treatment, and (3) the defendants did not submit reasonable charges to Allstate.

933.   The Count X defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

934.   This purpose was known to all of the Count X defendants and intentionally pursued.

935.   Despite knowing that the defendants were not entitled to reimbursement under the No-Fault Act because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because

164

they charged outrageous and unreasonable prices, the Count X defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment to the defendants.

936.   In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

937.   All of the Count X defendants benefited from the payments wrongfully procured from Allstate.

938.   All of the Count X defendants directly benefited from the payments made to Summit Physicians Group, PLLC, Summit Medical Group, PLLC, Summit Diagnostic Services, PLLC, and Greater Detroit Physical Therapy & Rehabilitation, P.C.

939.   Therefore, the Count X defendants committed acts that caused damage to Allstate.

940.   All of the Count X defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count X defendants in the commission of acts done for the benefit of all Count X defendants and to the unjustified detriment of Allstate.

941.   Accordingly, all of the Count X defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

## COUNT XI
## PAYMENT UNDER MISTAKE OF FACT
## Against Summit Physicians Group, PLLC, Summit Medical Group, PLLC, Summit Diagnostic Services, PLLC, and Greater Detroit Physical Therapy & Rehabilitation, P.C.

942.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 806 set forth above as if fully set forth herein.

943.   Allstate paid the amounts described herein and itemized in Exhibits 33 through 36 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the necessity of medical services purportedly provided by Summit Physicians Group, PLLC, Summit Medical Group, PLLC, Summit Diagnostic Services, PLLC, and Greater Detroit Physical Therapy & Rehabilitation, P.C.

944.   Allstate sustained damages by paying under a mistake of fact the claims submitted by, or on behalf of Summit Physicians Group, PLLC, Summit Medical Group, PLLC, Summit Diagnostic Services, PLLC, and Greater Detroit Physical Therapy & Rehabilitation, P.C. ("Count XI defendants"), which misrepresented the reasonableness, necessity, and lawfulness of the medical treatment allegedly rendered and/or whether the patient's injury arose out of a motor vehicle accident.

945.   The Count XI defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

946.   Allstate is entitled to restitution from each of the Count XI defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

**COUNT XII**
**UNJUST ENRICHMENT**
**Against Summit Physicians Group, PLLC, Summit Medical Group, PLLC, Summit Diagnostic Services, PLLC, and Greater Detroit Physical Therapy & Rehabilitation, P.C.**

947.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 806 set forth above as if fully set forth herein.

948.   Allstate paid monies, including those amounts set out in Exhibits 33 through 36, in response to the claims submitted, or caused to be submitted, by defendants Summit Physicians Group, PLLC, Summit Medical Group, PLLC, Summit Diagnostic Services, PLLC, and Greater Detroit Physical Therapy & Rehabilitation, P.C. ("Count XII defendants") in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

949.   Allstate's payments constitute a benefit which the Count XII defendants aggressively sought and voluntarily accepted.

950.   The Count XII defendants wrongfully obtained payments from Allstate through the fraudulent scheme detailed herein.

951.   The Count XII defendants have been unjustly enriched by receipt of these wrongfully obtained payments from Allstate.

952.   The Count XII defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XIII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

953.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 to 806 set forth above as if fully set forth herein.

954.   Defendants David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., Kevin Crawford, D.O., Thomas Giancarlo, D.O., Summit Physicians Group, PLLC, Summit Medical Group, PLLC, Summit Diagnostic Services, PLLC, and Greater Detroit Physical Therapy & Rehabilitation, P.C. ("Count XIII defendants") routinely performed medically unnecessary treatment with respect to the patients at issue in this Complaint.

955.   The Count XIII defendants also rendered medical treatment pursuant to a fraudulent scheme whereby patients were referred to them for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment.

956.   Summit Physicians Group, PLLC and Summit Diagnostic Services, PLLC submitted and continue to submit unreasonable charges for MRIs to Allstate.

957.   Pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, an insurer is liable to pay benefits only for reasonable and necessary expenses

arising out of a motor vehicle accident. Mich. Comp. Laws §§ 500.3105 and 500.3107.

958.   The lack of reasonableness, necessity, and lawfulness are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident. Mich. Comp. Laws § 500.3107.

959.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

960.   Further, providers may only charge a reasonable amount for the products, services, and accommodations rendered. Mich. Comp. Laws § 500.3157.

961.   The Count XIII defendants continue to submit claims under the No-Fault Act for unnecessary and/or unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

962.   The Count XIII defendants will continue to bill Allstate for No- Fault benefit payments absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and/or previously-denied No-Fault claims submitted by any of the Count XIII defendants for any or all of the reasons set out in the within Complaint.

963.   Summit Physicians Group, PLLC and Summit Diagnostic Services, PLLC will continue to bill Allstate unreasonable amounts for MRIs absent a declaration by this Court that their charges are unreasonable and that Allstate has no obligation to pay pending and/or previously-denied No-Fault claims submitted by Summit Physicians Group, PLLC and Summit Diagnostic Services, PLLC to the extent the same constitute unreasonable charges.

964.   Summit Physicians Group, PLLC, Summit Medical Group, PLLC, and Greater Detroit Physical Therapy & Rehabilitation, P.C. will continue to bill Allstate unreasonable amounts for prescription medications absent a declaration by this Court that their charges are unreasonable and that Allstate has no obligation to pay pending and/or previously-denied No-Fault claims submitted by Summit Physicians Group, PLLC, Summit Medical Group, PLLC, and Greater Detroit Physical Therapy & Rehabilitation, P.C. to the extent the same constitute unreasonable charges.

965.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIII defendants provided medically unnecessary and unlawful treatment that is not compensable under Michigan's No-Fault Act.

966.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIII defendants were engaged in a

fraudulent scheme whereby they provided medically unnecessary treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

967.   Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the charges for MRIs submitted by Summit Physicians Group, PLLC and Summit Diagnostic Services, PLLC are and were unreasonable at all relevant times.

968.   As such, the Count XIII defendants have no standing to submit, pursue, or receive assigned No-Fault benefits from Allstate.

## XIV.  **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Property and Casualty Insurance Company, Esurance Insurance Company, and Esurance Property and Casualty Insurance Company respectfully pray that judgment enter in their favor, as follows:

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Summit Physicians Group, PLLC Enterprise)
### Against David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., Kevin Crawford, D.O., and Thomas Giancarlo, D.O.

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Summit Physicians Group, PLLC Enterprise)
### Against David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., Kevin Crawford, D.O., and Thomas Giancarlo, D.O.

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Summit Medical Group, PLLC Enterprise)
### Against David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., and Kevin Crawford, D.O.

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

172

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Summit Medical Group, PLLC Enterprise)
### Against David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., and Kevin Crawford, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Summit Diagnostic Services, PLLC Enterprise)
### Against David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., Kevin Crawford, D.O., and Thomas Giancarlo, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Summit Diagnostic Services, PLLC Enterprise)
### Against David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., Kevin Crawford, D.O., and Thomas Giancarlo, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Greater Detroit Physical Therapy & Rehabilitation, P.C. Enterprise)
### Against Laran Johnathon Lerner, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Greater Detroit Physical Therapy & Rehabilitation, P.C. Enterprise)
### Against David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., and Kevin Crawford, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IX
### COMMON LAW FRAUD
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

175

## COUNT X
## CIVIL CONSPIRACY
## Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the

defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative

costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XI
## PAYMENT UNDER MISTAKE OF FACT
## Against Summit Physicians Group, PLLC, Summit Medical Group, PLLC, Summit Diagnostic Services, PLLC, and Greater Detroit Physical Therapy & Rehabilitation, P.C.

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XII
## UNJUST ENRICHMENT
## Against Summit Physicians Group, PLLC, Summit Medical Group, PLLC, Summit Diagnostic Services, PLLC, and Greater Detroit Physical Therapy & Rehabilitation, P.C.

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## <u>COUNT XIII</u>
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
## Against All Defendants

(a)     DECLARE that Allstate has no obligation to pay pending and/or previously denied No-Fault insurance claims submitted by David Peter Jankowski, D.O., Laran Johnathon Lerner, D.O., Kevin Crawford, D.O., Thomas Giancarlo, D.O., Summit Physicians Group, PLLC, Summit Medical Group, PLLC, Summit Diagnostic Services, PLLC, and Greater Detroit Physical Therapy & Rehabilitation, P.C. for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that the charges for MRIs submitted by Summit Physicians Group, PLLC and Summit Diagnostic Services, PLLC are not and were not reasonable and that Allstate has no obligation to pay any claim related to the same;

(c)     DECLARE that Allstate has no obligation to pay those portions of the MRI claims submitted by Summit Physicians Group, PLLC and Summit Diagnostic Services, PLLC that constitute unreasonable charges;

(d)     DECLARE that Allstate has no obligation to pay any amount excessing a reasonable amount for prescription medication submitted by Summit Physicians Group, PLLC, Summit Medical Group, PLLC, or Greater Detroit Physical Therapy & Rehabilitation, P.C. in the future;

(e)     DECLARE that Summit Physicians Group, PLLC's, Summit Medical Group, PLLC's, and Greater Detroit Physical Therapy & Rehabilitation, P.C.'s

charges for prescription medication are in some respect so excessive as to have no reasonable foundation; and

(f)    GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XV.  <u>JURY TRIAL DEMAND</u>

The plaintiffs hereby demand a trial by jury on all claims.

Respectfully submitted,

SMITH & BRINK

*/s/ Jacquelyn A. McEttrick*

_____

Richard D. King, Jr.
rking@smithbrink.com
Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
John D. Tertan
jtertan@smithbrink.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2303
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs*
*Allstate Insurance Company, Allstate*
*Property and Casualty Insurance*
*Company, Esurance Insurance*
*Company, and Esurance Property and*
*Casualty Insurance Company*

Dated:  October 13, 2016